In re AIR CRASH DISASTER NEAR NEW ORLEANS, LOUISIANA ON JULY 9, 1982.

Luis Alberto TRIVELLONI–LORENZI, and Susanna Electra Trivelloni-Lorenzi, Plaintiffs-Appellees,

v.

PAN AMERICAN WORLD AIRWAYS, INC., et al., Defendants-Appellants.

Ernesto Serio PAMPIN LOPEZ, Individually and As Administrator of the Estate of His Deceased Mother Sara E. Lopez De Pampin, Plaintiff-Appellee,

v.

PAN AMERICAN AIRWAYS, INC., and United States of America, et al., Defendants-Appellants.

Nos. 84–3832, 84–3833.

United States Court of Appeals, Fifth Circuit.

July 21, 1987.

Gee, Garza, Garwood, Circuit Judges, filed opinions concurring in part and dissenting in part.

Johnson, Circuit Judge, filed concurring opinion.

Patrick E. Higginbotham, Circuit Judge, filed opinion concurring in judgment.

Clark, Chief Judge, and Garza, Gee, Garwood, E. Grady Jolly, W. Eugene Davis and Edith H. Jones, Circuit Judges, did not join in opinion's reinstatement of panel's choice-of-law decision.

**1150**

Deutsch, Kerrigan & Stiles, Francis G. Weller, Frederick R. Bott, Darrell K. Cher-

ry, Robert E. Kerrigan, Jr., New Orleans, La., for defendants-appellants.

Stephen B. Murray, Romualdo Gonzalez, Patricia R. Murray, New Orleans, La., for plaintiffs-appellees.

Before CLARK, Chief Judge, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:[*]

These consolidated cases arise from the crash shortly after takeoff of Pan American World Airways Flight 759 near New Orleans, Louisiana. The plaintiffs are foreign citizens who sought recompense for their injuries in a Louisiana federal court. Pan American World Airways, Inc. (Pan American) invoked the doctrine of forum non conveniens, insisting that the plaintiffs' home country of Uruguay is the proper forum for the resolution of plaintiffs' claims. We took these cases en banc to decide whether the district court properly applied the doctrine of forum non conveniens. For the reasons stated below, we hold the plaintiffs' causes of action were properly tried in a Louisiana federal court.

### I.

On July 9, 1982, Pan American Flight 759 crashed in Kenner, Louisiana, shortly after takeoff from Moisant International Airport. All 154 persons aboard the plane perished. Eyewitness accounts established that seconds after takeoff Flight 759 suddenly descended and pitched to one side. The plane's wing struck a tree causing the wings to swing perpendicular to the ground. Within seconds the plane crashed exploding on impact. A later crash investigation concluded that a microburst wind

---

[*] Unless otherwise indicated this opinion is joined by all members of the court.

shear was a contributing cause to the accident.

Within weeks of this tragic accident, personal representatives of many of the deceased passengers filed wrongful death suits and survival actions in various United States district courts.[1] On August 12, 1982, plaintiffs filed their suits in the United States District Court for the Eastern District of Louisiana against Pan American, the Boeing Company (manufacturer of the airplane), and the New Orleans Aviation Board (operator of Moisant International Airport). Plaintiffs in these consolidated cases are citizens and residents of Uruguay, and are heirs of passengers killed in the crash of Flight 759. Luis Alberto and Susanna Electra Trivelloni-Lorenzi (Trivelloni children) brought suit for the wrongful death and as survivors of their parents Luis Alberto and Electra Iris Trivelloni who perished in the crash. Ernesto Serio Pampin Lopez (Pampin) brought suit for the wrongful death and as survivor of his mother Sara Lopez de Pampin, his sister Amparo Pampin Lopez, and his aunt Irma Lopez de Alvarez who perished in the crash. All of the decedents were citizens and residents of Uruguay who were on vacation in the United States.[2]

Plaintiffs also intended to join the United States as a defendant, but they had to exhaust their administrative remedies under the Federal Torts Claims Acts (FTCA), 28 U.S.C. § 2671 *et seq.*, before doing so. On April 29, 1983, plaintiffs commenced their administrative claims against the United States. At the time plaintiffs initiated their administrative claims against the United States, they were not aware that on January 26, 1983, Pan American had indicated to the district court that Pan American and the United States were prepared to stipulate to liability. Plaintiffs did not have access to the information because it had been placed in a sealed minute entry. The information was not disclosed to plaintiffs until mid-summer of 1983, over one year after the crash.

At a pretrial hearing on July 29, 1983, Pan American advised the district court and plaintiffs that it intended to move to dismiss plaintiffs' cases on the ground of forum non conveniens. Pan American's counsel stated that "we're going to take the position that if liability is not an issue ... that the damage issues in the foreign [plaintiffs'] cases belong in the countries from which they came...." The district court instructed Pan American to file its motion to dismiss for forum non conveniens, but in an effort to expedite matters, the court informed Pan American that its motion would be denied. Recognizing that all the parties knew the United States was to be joined as a defendant after the administrative process was completed and anticipating such joinder, the district court stated:

> The government is a defendant; the government is going to remain a defendant. I can tell you how I'm going to rule on the motion, so we can go on to the next issue. Really, I'm going to rule that you have no right to that transfer, and I'm going to rule that that issue hanging there is not going to stop me from ruling on it, that I'm not going to do it, and you can sign the stipulations. We're going to go to trial here on damages, with the government as a defendant and with the crash happening here ... The crash was here, and the United States is a party.

1. Of the numerous actions arising from this crash, approximately 52 were filed on behalf of 42 passengers of Flight 759 who were foreign nationals. Most of these actions were brought in California and Florida. On October 13, 1982, the Judicial Panel on Multi-district Litigation transferred all federal actions arising out of this accident to the Eastern District of Louisiana for pretrial proceedings.

Pretrial proceedings in these cases were completed in late 1984, and on January 9, 1985, the Multi-district Litigation Panel remitted the cases to the courts in which they were originally filed for further proceedings.

2. The deceased passengers had purchased their round trip tickets in Montevideo, Uruguay. Their tickets provided for a flight from Montevideo to the United States, flights within the United States, and then a return flight to Montevideo. When Flight 759 crashed the decedents were en route to Las Vegas, Nevada, prior to returning home.

On August 22, 1983, Pan American did file its motion to dismiss plaintiffs' cases on the ground of forum non conveniens.[3] In connection with the motion, Pan American stated that it would: (1) submit to jurisdiction of the courts of Uruguay, (2) concede liability, (3) waive any statute of limitations defense, (4) waive the Warsaw Convention's limitation of damages provision, and (5) guarantee satisfaction of any judgment entered against it in Uruguay. In its motion Pan American argued that the United States was an unnecessary party since Pan American had guaranteed payment of any judgment rendered against Pan American in Uruguay. The motion went on to contend that dismissal on the basis of forum non conveniens was proper because only the damages issue remained and that this issue could best be litigated in Uruguay. In a minute entry docketed September 6, 1983, the district court denied the motion. Pan American moved for reconsideration or alternatively for certification of the ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court denied both requests. Pan American petitioned this court for a supervisory writ of mandamus, but on January 18, 1984, we refused to issue the writ.[4]

On December 16, 1983, while Pan American was attempting to gain interlocutory review of the district court's denial of its motion to dismiss for forum non conveniens, plaintiffs, Pan American, and the United States entered into a stipulation as to liability, damages, defenses, and payment under any subsequent judgment.[5] As anticipated by the parties, plaintiffs' administrative claims under the FTCA were unsuccessful,[6] and on February 17, 1984, plaintiffs amended their complaints to make the United States a party defendant.[7] The final procedural posturing of these cases occurred when defendants Boeing Company and New Orleans Aviation Board were dismissed with prejudice pursuant to the December 16 stipulation.

With the parties to these actions finally aligned, the district court made several pretrial decisions on the law which would apply. The court held that Pan American had failed to show any significant difference between the law of Uruguay and Louisiana; therefore, the law of Louisiana would apply. The court, however, later granted Pampin's motion requesting that Uruguayan law apply insofar as it recognized a nephew's claim for the wrongful death of an aunt; Louisiana law recognized no such claim. The court also struck Pan American's defense that sought to invoke the damages limitations of the Warsaw Convention and the Montreal Agreement[8] because the notices of liability limitation on the plaintiffs' tickets were not furnished in the required ten-point type size.

Both the Trivelloni and Pampin cases went to trial on the same day. The trials were physically consolidated while the juries heard from two witnesses to the crash

---

3. Pan American also proferred its motion to dismiss on grounds of forum non conveniens as to all claims by or on behalf of foreign citizens arising from the crash of Flight 759 then pending in the Eastern District of Louisiana.

4. Pan American suggested that the court, sitting en banc, should consider the petition for mandamus; however, no member of the court requested a poll on the suggestion.

5. The December 16 stipulation in the Trivelloni-Lopez case is reproduced in Appendix A to this opinion. A similar stipulation was also entered in the Pampin case.

6. Plaintiffs received written notification that their claims against the United States had been denied on January 16, 1984. It was not until this time that plaintiffs could properly sue the United States. See 28 U.S.C. § 2675.

7. In their amended complaints, plaintiffs alleged that the agents and employees of the Federal Aviation Administration, an agency of the United States, were negligent in operating the New Orleans International Airport tower and in disseminating information on weather conditions at the time of Flight 759's take-off.

8. The Warsaw Convention, 49 U.S.C. § 1502 note, as modified by the Montreal Agreement, restricts damages to $75,000 for any wrongful death of an international air passenger if certain notification prerequisites are carried out. See CAB Order E–23680, 31 Fed.Reg. 7302 (1966). See generally In re Air Crash at Warsaw, Poland, 705 F.2d 85 (2d Cir.), cert. denied, 464 U.S. 845, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983).

and from an anthropological expert who testified as to South American mores and familial relationships. The trials were then separated for presentation of evidence particular to each family. The Trivelloni jury awarded $25,000 each for the pre-impact pain and suffering of Luis and Electra Trivelloni, $75,000 to each Trivellino child for the death of their parents, and $3,530 for loss of their parents' personal effects, for a total of $203,530. The Pampin jury awarded $25,000 for the pre-impact pain and suffering of each of Ernesto Pampin's deceased relatives, $12,000 for the post-impact pain and suffering of Pampin's aunt Irma Lopez de Alvarez, $250,000 for the death of his mother, $150,000 for the death of his sister, $13,000 for the death of his aunt, and $16,853.89 for loss of his relatives' personal effects, for a total of $516,-853.89. The district court entered judgment in each case against Pan American and the United States consistent with the verdicts and denied all post-trial motions.

On appeal a panel of this court affirmed the district court's denial of Pan American's motion to dismiss for forum non conveniens, affirmed the district court's decision to apply Louisiana law to the damages issues with the exception that Uruguayan law would apply to permit Pampin recovery for the death of his aunt, and affirmed the district court's refusal to apply the Warsaw Convention/Montreal Agreement damage limitation.[9] *In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982,* 789 F.2d 1092 (5th Cir.1986). As to the damages awarded, the panel affirmed the award of pre-impact pain and suffering for each family victim but based upon the evidence ordered a remittitur to $7,500 for each decedent or alternatively a new trial. *Id.* at 1099. The award of post-impact damages to Pampin for the pain suffered by his aunt was affirmed as was the award

to Pampin for the loss of his mother.[10] *Id.* at 1100. The panel affirmed the damage award given to Pampin for the loss of his sister but ordered a remittitur to $50,000 or, alternatively, a new trial. *Id.* at 1100. Finally, the panel affirmed the district court's award of prejudgment interest against Pan American but reversed the prejudgment interest award against the United States because such award was prohibited by federal statute. *Id.* at 1101 (citing 28 U.S.C. § 2674).

Neither party was particularly pleased with the outcome of the panel decision. Plaintiffs applied for panel rehearing on the issue of the remittiturs of the awards for pre-impact damages. Pan American applied for en banc rehearing on the forum non conveniens issue pursuant to Fed.R. App.P. 35 and Loc.R. 35. We granted rehearing en banc to consider particularly the forum non conveniens issue. *In re Air Crash Near New Orleans, Louisiana on July 9, 1982,* 795 F.2d 381 (5th Cir.1986).

Several issues relating to the doctrine of forum non conveniens are raised in this appeal. We will address the following questions: (1) In applying forum non conveniens in a diversity action, does a federal court apply the forum non conveniens law of the state in which it sits or federal forum non conveniens law; (2) Can a federal district court apply the doctrine of forum non conveniens in a case governed by the Warsaw Convention; (3) If federal law applies, what are the requirements of the doctrine of forum non conveniens; (4) How should the doctrine be applied by a district court; (5) What is our standard of review; and, finally (6) Was the doctrine applied properly in these cases. We now turn to a discussion of each issue.

## II.

The doctrine of forum non conveniens rests upon a court's inherent power

---

9. In addressing the forum non conveniens issue, the panel first performed a choice-of-law analysis. The panel concluded that Louisiana law was correctly applied to most elements of the damages. *In re Aircrash,* 789 F.2d at 1097 (citing *Restatement (Second) on Conflicts of Laws* §§ 175, 178 (1982)). Since American law applied, the panel stated that the district court's ruling would be upheld unless the cases were

more properly tried in a foreign forum. In light of the issues involved, the panel decided that Louisiana was the proper forum in which these cases should be heard. *Id.* at 1098.

10. The damages given to the Trivellino children for the loss of their parents were also affirmed without remittitur.

to control the parties and cases before it and to prevent its process from becoming an instrument of abuse or injustice. Through this power a federal trial court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, where it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 530, 67 S.Ct. 828, 835, 91 L.Ed. 1067 (1947); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). The doctrine arose in the areas of admiralty and equity, but it is now applied in a wide spectrum of cases in both federal and state courts.[11] *Compare Syndicate 420 At Lloyd's London v. Early American Insurance Co.*, 796 F.2d 821, 825 (5th Cir.1986) (maritime insurance contracts case) *with Watson v. Merrell Dow Pharmaceuticals*, 769 F.2d 354, 359–60 (6th Cir.1985) (strict liability pharmaceutical case). *See generally* Note, *The Convenient Forum Abroad Revisited: A Decade of Development of the Doctrine of Forum Non Conveniens in International Litigation in the Federal Courts*, 17 Va.J.Int'l L. 755 (1977). Before we examine the forum non conveniens analysis that is to be applied in these cases, we must address two preliminary matters.

### A.**

First, since these cases are based upon diversity jurisdiction, we are faced with the question of whether we are bound by Louisiana forum non conveniens law or federal forum non conveniens law under the teachings of *Erie RR. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Several courts, including the Supreme Court, have declined to decide whether, under *Erie*, state or federal law of forum non conveniens applies in diversity cases. *See Piper Aircraft Co. v. Reyno*, 454 U.S. at 248 n. 13, 102 S.Ct. at 262 n. 13; *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843; *De Melo v. Lederle Laboratories*, 801 F.2d 1058, 1061 n. 2 (8th Cir.1986). On each of these occasions the courts reasoned that the issue need not be decided because the state and federal forum non conveniens law were virtually identical. *Piper Aircraft Co. v. Reyno*, 454 U.S. at 248 n. 13, 102 S.Ct. at 262 n. 13; *Gulf Oil Corp.*, 330 U.S. at 509, 67 S.Ct. at 843; *De Melo*, 801 F.2d at 1061 n. 2. *See also Schertenleib v. Traum*, 589 F.2d 1156, 1162 n. 13 (2d Cir. 1978) ("intriguing question" need not be addressed because federal and New York law the same). In this case, however, Louisiana forum non convenience law is substantially different than federal forum non conveniens law.[12] We must therefore decide whether the district court in this case was obliged to apply either the federal or Louisiana law of forum non conveniens.

A Louisiana court has recently discussed the state's forum non conveniens law. In *Kassapas v. Arkon Shipping Agency, Inc.*, 485 So.2d 565 (La.Ct.App. 5th Cir.), *writ denied*, 488 So.2d 203 (La.), *cert. denied*, — U.S. —, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986), the issue before the court was whether Louisiana courts may, absent statutory authorization, conditionally dismiss a suit to a foreign country on the ground of forum non conveniens. The Louisiana Court of Appeals answered emphatically in the negative. The *Kassapas* court first noted that the common law doctrine of forum non conveniens was almost nonexistent in Louisiana jurisprudence as a result of the state's French legal heritage.

---

**11.** For the history and evolution of the doctrine from its Anglo-Scottish origins, *see* Barrett, *The Doctrine of Forum Non Conveniens*, 35 Cal.L. Rev. 380 (1947); Bickel, *The Doctrine of Forum Non Conveniens as Applied to the Federal Courts in Matters of Admiralty*, 35 Cornell L.Q. 12 (1949); Blair, *The Doctrine of Forum Non Conveniens in Anglo-American Law*, 29 Colum.L. Rev. 1 (1929); Note, *The Convenient Forum Abroad*, 20 Stan.L.Rev. 57 (1967).

** Judge Higginbotham does not join in this section of the opinion.

**12.** For a description and discussion of federal forum non conveniens law see *infra* parts III A, B.

*Id.* at 566; *see also* Pausen & Burrick, *Forum Non Conveniens in Admiralty*, 13 J.Mar.L. & Com. 341, 363 (1982) ("The doctrine of forum non conveniens is alien to French law."). In a leading case on forum non conveniens dismissal in Louisiana, the court stated "that the doctrine of forum non conveniens is foreign to our jurisprudence and contrary to express legislative declaration." *Trahan v. Phoenix Insurance Co.*, 200 So.2d 118, 122 (La.Ct.App. 1st Cir.), *cert. denied no error of law*, 251 La. 47, 202 So.2d 657 (1967); *see also Chaney v. Williher*, 205 So.2d 770, 771 (La.Ct. App. 1st Cir.1967), *cert. denied*, 251 La. 940, 207 So.2d 541 (1968).

The *Kassapas* court, however, noted that the Louisiana Legislature had responded to *Trahan* by adopting article 123 of the Louisiana Code of Civil Procedure. Article 123 provides:

> For the convenience of the parties and the witnesses, in the interest of justice, a district court upon contradictory motion, or upon the court's own motion after contradictory hearing, may transfer a civil case to another district court where it might have been brought, provided, however, that no suit brought in the parish of which the plaintiff is domiciled and which court is otherwise a court of competent jurisdiction and proper venue, shall be transferred to any other court pursuant to this article.

The *Kassapas* court reasoned that article 123 only authorized transfers between Louisiana district courts. The court stated:

> [T]he Legislature added what is now La. Code Civ.Pro. art. 123, to provide for forum non conveniens transfer from one district court to another. That article does not provide for transfer to a foreign forum, nor does it permit forum non conveniens dismissal. In this court's opinion, the *Trahan* holding that the common law or federal doctrine of forum non

conveniens does not exist in our law is still viable, except to the limited extent art. 123 authorizes transfer from one district court to another within the State of Louisiana.

*Kassapas*, 485 So.2d at 566.

Finally, the *Kassapas* court refused to follow either *Smith v. Globe Indemnity Company*, 243 So.2d 882 (La.Ct.App. 1st Cir.1971), or *Symeonides v. Cosmar Compania Naviera*, 433 So.2d 281 (La.Ct.App. 1st Cir.1983), since their statements that forum non conveniens transfer or dismissal to a foreign forum might be allowable under article 123 were dicta and unsupported by statutory language. Both *Smith* and *Symeonides* applied the federal "balancing of conveniences" approach to forum non conveniens motions.

Since *Kassapas* is the last and most definite statement on Louisiana forum non conveniens law, we believe it is reasonable to consider it the current law in Louisiana for *Erie* analysis. *See Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351, 1360 (5th Cir.1983), *cert. denied*, 465 U.S. 1028, 104 S.Ct. 1288, 79 L.Ed.2d 690 (1984). Thus, if we are bound to apply the Louisiana rule as a diversity court, our inquiry would end and the district court would be affirmed, albeit on different grounds. We cannot, however, under *Erie* take this expeditious avenue toward resolution of this appeal. We turn then to the difficult *Erie* question presented.

It is often said that the "general rule" is that federal diversity courts "apply state substantive law and federal procedural law"; and indeed the statement is roughly accurate. This general rule however only describes the *outcome* of *Erie* analysis. What we classify as "substantive" are precisely those matters governed by state law—and as "procedural" those matters governed by federal law—in federal diversity cases.[13] Moreover, the normal mean-

---

13. Justice Frankfurter warned us against reifying the "substance/procedure" labels long ago:

Matters of "substance" and matters of "procedure" are much talked about in the books as though they defined a great divide cutting across the domain of law. But, of course, "substance" and "procedure" are the same key-words to very different problems. Neither "substance" nor "procedure" represents the same invariants. Each implies different variables depending upon the particular problems for which it is used. And the different problems are only distantly related at best, for the terms are in common use in connection

ings of the words "substance" and "procedure" will not always stretch to provide the appropriate *Erie* label, but that has not kept us from applying, for example, state "procedural" rules in a diversity case. *See, e.g., Conway v. Chemical Leaman Lines, Inc.,* 540 F.2d 837, 839 (5th Cir.1976) (*Erie* policies require application of state rule evidence in diversity case). Thus it has been stated that *Erie* is "[a] policy so important to our federalism [that it] must be kept free from entanglements with analytical or terminological niceties." *Guaranty Trust Co. v. York,* 326 U.S. 99, 110, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945).

Again, as a general proposition, we often hear the abstract definition of "substantive rules" as those "which establish the rights of parties and generally determine the outcome of litigation." Under this definition we would be hardpressed to hold that *forum non conveniens* is "procedural" because, as a practical matter, only an outright dismissal with prejudice could be more "outcome determinative" than a conditional dismissal to a distant forum in a foreign land. But the question is obviously not so simple. As we have noted, the Supreme Court has assiduously avoided deciding whether state or federal law controls a *forum non conveniens* determination in a federal diversity court, and respected authority exists for both views. *Compare, e.g. Sibaja v. Dow Chemical Co.,* 757 F.2d

1215, 1219 (11th Cir.), *cert. denied* —— U.S. ——, ——, 106 S.Ct. 347, 348, 88 L.Ed.2d 294 (1985) (federal law of *forum non conveniens* applies in diversity cases because doctrine is procedural) *with Weiss v. Routh,* 149 F.2d 193, 194–95 (2d Cir.1945) (state law controls *forum non conveniens* question in diversity case);[14] *see also* Speck, *Forum Non Conveniens and Choice of Law in Admiralty: Time for an Overhaul,* 18 J.Mar.Law & Com. 185 (1987) (collecting numerous cases going both ways). *See generally* 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3828, at 194 (2d ed. 1986) ("Although the Supreme Court has repeatedly found that it did not need to decide whether state notions of forum non conveniens were binding on a federal court in a diversity action, it seems quite clear that they ought not to be and that these are matters of the administration of the federal courts, not rules of decision, so that state rules cannot be controlling.").

The fact that Louisiana courts have labeled the *forum non conveniens* doctrine "procedural" does not decide the *Erie* question of whether a federal court sitting in diversity applies state or federal notions of forum non conveniens. As Justice Frankfurter said when considering another question under *Erie:*

It is therefore immaterial whether statutes of limitation are characterized either

---

with situations turning on such different considerations as those that are relevant to *ex post facto* legislation, the impairment of obligations of contract, the enforcement of federal rights in the state courts and the multitudinous phases of the conflict of laws.

And so, putting to one side abstractions regarding "substance" and "procedure," we have held that in diversity cases the federal courts must follow the law of the State as to burden of proof, as to conflict of laws, as to contributory negligence. *Erie R. Co. v. Tompkins* has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases in the federal courts.

*Guaranty Trust Co. v. York,* 326 U.S. 99, 108–10, 65 S.Ct. 1464, 1469–70, 89 L.Ed. 2079 (1945) (citation omitted).

**14.** Learned Hand's brief formulation of the argument is, as usual, persuasive:

It might be argued that those considerations which will set a court in motion are peculiar

and personal to itself, and that it does not follow that what is enough to move a state court to act, should be enough to move a federal; or vice versa. Such a doctrine would, however, imply that the decision to accept jurisdiction is not controlled by any principle and may be at the judge's whim; and that would certainly be too strong a statement. Here, as elsewhere, although judicial discretion does indeed imply that the limits are not rigidly fixed, it does not mean that there are none; and in dealing with the question at bar, we are to remember the purpose of conformity in "diversity cases." It is that the accident of citizenship shall not change the outcome: a purpose which extends as much to determining whether the court shall act at all, as to how it shall decide, if it does. For this reason it seems to us that we should follow the New York decisions.

149 F.2d at 195.

as "substantive" or "procedural" in State court opinions in any use of those terms unrelated to the specific issue before us. *Erie R. Co. v. Tompkins* was not an endeavor to formulate scientific legal terminology. It expressed a policy that touches vitally the proper distribution of judicial power between State and federal courts.

*Guaranty Trust,* 326 U.S. at 109, 65 S.Ct. at 1470. State decisions can be helpful but they cannot be used as a substitute for *Erie* analysis. The state courts may have slapped the "procedure" label on an issue for purposes that are completely divorced from the policies underlying *Erie.*

Since the "general rules" are not of substantial aid in resolving the *Erie* question before us, we go back to the beginning—*Erie Railroad v. Tompkins*—to decide whether state or federal law controls the *forum non conveniens* issue in a federal diversity court. The narrow holding of *Erie* was that neither Congress nor the federal courts have power under the Constitution "to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts." 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). It soon became clear, however, that the *Erie* doctrine was not confined to the question of federal power. By the time of *Guaranty Trust* the Supreme Court spoke only of the *Erie* "policy," and the opinion gave no suggestion that the rationale of *Erie* should be confined to rules that the federal courts lacked the constitutional power to create. In *Hanna v. Plumer,* the Court stated *Erie* policy encompassed "the twin aims of ... discouragement of forum-shopping and avoidance of the inequitable administration of the laws." 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965).

Therefore, our task is to evaluate whether applying federal *forum non conveniens* in this case advances or hinders the "twin aims" of *Erie.* But first, two clarifications are in order. One, the "forum-shopping" concern is not really the problem of forum-shopping in itself. After all, the purpose of diversity jurisdiction is to *allow* a certain kind of forum-shopping. Rather, the "forum-shopping" concern for *Erie* purposes is the unfairness of giving one set of plaintiffs (those who can sue in federal court) some particular advantage unavailable to non-diverse plaintiffs who must proceed in state court. Two, the *Hanna* Court's second purpose—"inequitable administration of the laws"—is ambiguous. This purpose may refer either to extrinsic considerations of the fairness of the competing state and federal rules to the parties—*"inequitable* administration"—or to intrinsic considerations of the federal forum's own interests —"inequitable *administration."* We conclude that *Hanna* intends the latter. The former interpretation would take federal courts into an analysis of the "fairness" of the state rule, in other words, its wisdom and propriety. This could only lead to normative assertions by federal courts that a given state law cannot be applied because to do so would be "inequitable." But it was precisely this normative role, this role of federal courts as prophets of a "brooding omnipresence," that *Erie* condemned. Therefore, *Hanna*'s second aim must refer to the federal courts' own interests in equitable self-administration.

Because almost any difference between the rules applied in state and federal courts can lead to different outcomes and "forum-shopping"—the ability of diversity plaintiffs to gain advantages denied to others—the first aim of *Erie* is always best satisfied by applying state law. To determine the importance of this aim for a particular issue, the question is always "how different will the outcomes be?" If Louisiana courts refuse to dismiss on *forum non conveniens* grounds, and if that doctrine does not apply to a Louisiana cause of action in a federal diversity court, there will be a tremendous disparity of result between trials in the two court systems. One case will proceed to judgment and the other will be dismissed to a foreign land.

Here we face a twist on the usual problem. The usual problem of forum-shopping in the *Erie* context is the ability of *plaintiffs* to choose an advantageous federal forum; there is an obvious inequity in allow-

ing out-of-state plaintiffs advantages over local plaintiffs in suits under the same substantive law of the forum state. However, the occasional state court that refuse to apply *forum non conveniens*—like Louisiana—become the advantageous forum for some relevant group of both local and nonresident plaintiffs. Thus, the differing state and federal rules contemplated by this case have no forum-shopping implications for plaintiffs. But there will be diversity between the parties in many such cases. Defendants in those cases will be able to remove the case to federal court, negating any plaintiff's advantage. Thus, our decision today will give some (arbitrary) set of *defendants* the ability to "forum-shop," *i.e.*, to receive an advantage in the federal court unavailable to the defendants who must remain in the state court. But this defendant-forum-shopping twist does not alter the unavoidable conclusion: The enormous difference between the outcomes of state and federal proceedings points forcefully toward applying state law under the first aim of *Erie.*

On the other hand, the interests of the federal courts in maintaining the federal doctrine even in a diversity case are powerful. We can describe those interests no better than has a panel of our colleagues on the Eleventh Circuit:

> The doctrine [of *forum non conveniens* ] derives from the court's inherent power, under article III of the Constitution, to control the administration of the litigation before it and to prevent its process from becoming an instrument of abuse, injustice and oppression.
>
> \* \* \* \* \* \*
>
> The doctrine addresses "whether the actions brought are vexatious or oppressive or whether the interests of justice require that the trial be had in a more appropriate forum" *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 530, 67 S.Ct. 828, 834–35, 91 L.Ed. 1067 (1947)....
>
> \* \* \* \* \* \*
>
> The Court's interest in controlling its crowded docket also provides a basis for the Court's inherent power to dismiss on

grounds of *forum non conveniens:* "the 'chosen forum is inappropriate because of consideration affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno,* 454 U.S. [235,] at 241, 102 S.Ct. [252,] at 258 [70 L.Ed.2d 419 (1981) ] (quoting *Koster v. Lumbermans Mutual Casualty Co.,* 330 U.S. at 524, 67 S.Ct. at 831–32). "Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 590–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The *forum non conveniens* doctrine is "designed in part to help courts avoid conducting complex exercises in comparative law," *Piper Aircraft Co.,* 454 U.S. at 251, 102 S.Ct. at 263....

*Sibaja v. Dow Chemical Co.,* 757 F.2d 1215, 1218–19 (11th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985) (brackets in original omitted). Federal forum interests in self-management point forcefully toward applying federal law under the second aim of *Erie.*

Our analysis of *Erie*'s twin aims in the context of selecting state or federal forum non conveniens law produces conflicting indications on how to resolve the issue. The aim of dissuading forum-shopping says apply Louisiana law in this diversity case. The other aim says apply federal law as a matter of internal consistency and administration. We have seen this kind of problem before. We have held that the sufficiency of the evidence is a federal question in a diversity court precisely because the federal forum's interest in self-management overrides uniformity concerns:

> Federal courts must be able to control the fact-finding processes by which the rights of litigants are determined in order to preserve the "essential character" of the federal judicial system. Of course, we do not contend that this control will not affect state-created substantive rights in some cases. Ultimately,

however, the integrity of our fact-finding processes must outweigh considerations of uniformity.

*Boeing Co. v. Shipman,* 411 F.2d 365, 369–70 (5th Cir.1969) (en banc). The holding of *Boeing* has been extended to other aspects of the judge-jury relationship without discussion of the *Erie* problems involved. For example, under Mississippi law the trial judge must first determine for himself that a defendant insurer had no "reasonably arguable" basis for denying coverage before submitting the question of punitive damages to the jury. *Blue Cross & Blue Shield of Mississippi v. Campbell,* 466 So.2d 833, 842 (Miss.1985). We have refused to apply that standard in diversity cases, *Jones v. Benefit Trust Life Insurance Co.,* 800 F.2d 1397, 1400 (5th Cir.1986) (*Boeing* is the appropriate standard; no discussion of *Erie*), even though the state standard clearly involves important substantive state policies of insurance regulation, and even though the federal standard will consistently skew the results of claims for punitive damages in favor of plaintiffs. The result in *Jones* may be inconsistent with *Byrd v. Blue Ridge Rural Electric Corp.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). *Byrd* held that federal law could override an inconsistent state procedure only when the state "requirement appears to be merely a form or mode of enforcing the immunity, and not a rule intended to be bound up with the definition of the rights and obligations of the parties." 356 U.S. at 536, 78 S.Ct. at 900. We think, in the light of later authority, that *Byrd* gave too little recognition to the federal forum-*qua*-forum interests. Compare *Hanna v. Plumer,* which held that Congress has the power to override state law by the Federal Rules in "matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either." 380 U.S. at 472, 85 S.Ct. at 472. *Hanna* gives us good reason to hold that federal courts have inherent powers under Article III to displace state laws on matters involving their basic competence as courts. *Boeing* and *Jones* are correct because the relationship between judge and jury goes to the heart of the independence and integrity of an Article III court.

Thus we face a difficult *Erie*-doctrine choice. We must choose between maintaining important internal administrative and equitable powers of our courts at the cost of disuniformity of result between state and federal diversity courts, or uniformity at the cost of giving up part of our self-regulatory powers. It is fashionable to call a difficult choice between important objectives a "balancing" test, but we decline to resort to this metaphor. It is simply a matter of choice, and choose we must.

We hold that the interests of the federal forum in self-regulation, in administrative independence, and in self-management are more important than the disruption of uniformity created by applying federal *forum non conveniens* in diversity cases. We are far down this road already, having made a series of similar choices in cases such as *Boeing Co. v. Shipman* and its progeny. We think those choices were correct. We therefore hold that a federal court sitting in a diversity action is required to apply the federal law of forum non conveniens when addressing motions to dismiss a plaintiff's case to a foreign forum.[15]

15. While federal law of forum non conveniens is to be applied in diversity cases, we note that the availability of the doctrine of forum non conveniens has been greatly restricted. Only when the more convenient forum is a foreign country can a suit brought in a proper federal venue be dismissed on grounds of forum non conveniens. Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3828, at 279–80 (2d ed. 1986); *see also Pain v. United Technologies Corp.,* 637 F.2d 775, 784–85 (D.C. Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Schertenleib v. Traum,* 589 F.2d 1156, 1159 (2d Cir.1978).

If the motion seeks a change of forum within the federal system, 28 U.S.C. § 1404(a) applies instead of the common law doctrine of forum non conveniens. Section 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

### B.

Having decided which forum non conveniens law is to be applied, we next address whether the district court in this case had the power to apply the doctrine. Plaintiffs contend that the common law doctrine of forum non conveniens as it exists in the federal system may not be applied to an action governed by the Warsaw Convention since article 28(1) of the Convention vests the absolute choice of forum in a plaintiff. The plaintiffs' position is a unique argument which our research indicates has never been addressed much less decided.[16]

■ At the outset we recognize that the parties agree that the provisions of the Warsaw Convention are applicable to these actions. The parties concurred at a pretrial hearing that the plaintiffs' deceased relatives were passengers in international air transportation. Furthermore, Pan American attempted to impose, albeit unsuccess-

fully, the damage limitation of the Convention since international air travel was involved in this crash. By its express terms the Convention is applicable to all persons travelling internationally by air.[17] We therefore conclude that the Convention is applicable to the plaintiffs' causes of action.[18] *See Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851, 853–54 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965); *Hill v. United Airlines*, 550 F.Supp. 1048, 1054 (D.Kan.1982).

■ The issue before us is whether the Warsaw Convention suspends a federal court's power to apply the doctrine of forum non conveniens in a case governed by the Convention. The Warsaw Convention of 1929 is a multilateral treaty that regulates claims for damages and other disputes which arise between passengers and international air carriers. *See* Lowenfeld & Mendelsohn, *The United States and the*

---

In addressing the distinction between section 1404(a) and the forum non conveniens doctrine, the Supreme Court stated:

> Congress enacted § 1404(a) to permit change of venue between federal courts. Although the statute was drafted in accordance with the doctrine of forum non conveniens, it was intended to be a revision rather than a codification of the common law. District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of forum non conveniens.

*Piper Aircraft Co. v. Reyno*, 454 U.S. at 253, 102 S.Ct. at 264–65 (citations omitted). *See generally* Fitzpatrick, *"Reyno": Its Progeny And Its Effects On Aviation Litigation*, J. Air L. & Com. 539, 542–43 (1983).

**16.** We have found but one case in which this argument has been raised. An amicus curiae argued that the district court could not invoke the doctrine of forum non conveniens to deprive a plaintiff of the right to litigate in the United States, a proper Warsaw Convention forum. *See Irish National Insurance Co. Ltd. v. Aer Lingus Teoranta*, 739 F.2d 90, 91 (2d Cir. 1984). The Second Circuit declined to decide the issue.

Furthermore, some courts have simply applied the forum non conveniens doctrine without addressing the possible effect of section 28(1) of the Warsaw Convention. *E.g., McLoughlin v. Commercial Airways (PTY) Ltd.*, 602 F.Supp. 29, 33 (E.D.N.Y.1985).

**17.** Article 1, section 1, of the Convention provides:

> This convention shall apply to all international transportation of persons, baggage or goods performed by aircraft for hire....

Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. § 1502 note, at 430.

The Convention in article 1, section 2, defines international air travel as transportation that (1) begins in one sovereign nation and ends in another, or (2) begins and ends in the same nation but with stops in other nations. *Id.* The plaintiffs' deceased relatives' travels fall into this latter category.

**18.** It might be argued that a party must plead a cause of action under the Convention before its provisions would be applicable. *Cf. Boehringer-Mannheim Diagnostics v. Pan Am World Airways*, 737 F.2d 456, 458 (5th Cir.1984) (Warsaw Convention creates cause of action), *cert. denied*, 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985). The plaintiffs have not affirmatively pled causes of action arising under article 17 of the Convention. *See* 49 U.S.C. § 1502 note, at 433 ("The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger...."). We do not believe the Convention should be read so narrowly especially in light of its overall intent to establish a uniform system for treatment of international air travel disputes. *See Mertens*, 341 F.2d at 854–56 (applying Convention to diversity case without pleading of Convention cause of action); *Hill*, 550 F.Supp. at 1053–54 (same).

*Warsaw Convention,* 80 Harv.L.Rev. 497 (1967). The Convention provides for ticketing and baggage standards, freight shipment regulations, carrier liability, liability limitations, and, of particular interest in this case, jurisdictional requirements. The United States adopted the treaty in 1934.[19] Commentators are in general agreement that the delegates to the Convention were most concerned with limiting the locations in which an air carrier would have to defend an action, with ensuring that an injured party have an available forum in which to redress his injuries, and with allowing the suit to be heard in a forum that had some interest in the dispute.[20]

As a manifestation of these concerns, article 28(1) of the Convention establishes four national forums in which an injured party may bring suit for damages inflicted by an international air carrier. Article 28(1) reads:

> An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or his principal place of business, or where he has a place of business through which the contract has

been made, or before the court at the place of destination.

The delegates, however, recognized that the Convention's provisions would have to be applied and adopted to a variety of legal systems, so they provided in article 28(2) that "[q]uestions of procedure shall be governed by the law of the court to which the case is submitted." [21]

Plaintiffs insist that article 28(1)'s language "at the option of the plaintiff" grants them the absolute and inalterable right to choose the national forum in which their claims will be litigated. We cannot agree. We are of the opinion that article 28(1) offers an injured passenger or his representative four forums in which a suit for damages may be brought. The party initiating the action enjoys the perogative of choosing between these possible national forums but that selection is not inviolate. That choice is then subject to the procedural requirements and devices that are part of that forum's internal laws. *See Smith v. Canadian Pacific Airways, Ltd.,* 452 F.2d 798, 800 (2d Cir.1971); *Mertens,* 341 F.2d at 855–56; *Hill,* 550 F.Supp. at 1054.[22] As one commentator on the Convention has

**19.** As a ratified treaty of the United States the Warsaw Convention is equal in stature and force as any other domestic federal law. *See Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244, 1246 (5th Cir.1978); *Smith v. Canadian Pacific Airways, Ltd.,* 452 F.2d 798, 801 (2d Cir.1971).

**20.** *See generally* McHenry, *Judicial Jurisdiction Under the Warsaw Convention,* 29 J. Air L. & Com. 205 (1963); Lowenfeld & Mendelsohn, *The United States and The Warsaw Convention,* 80 Harv.L.Rev. 497 (1967); Robbins, *Jurisdiction Under Article 28 Of The Warsaw Convention,* 9 McGill L.J. 352 (1963); Note, *Article 28 of the Warsaw Convention: A Suggested Analysis,* 50 Minn.L.Rev. 697 (1965–66).

**21.** These two sections have been construed as creating three stages of analysis for determining where a damage suit arising from an international air transportation accident should be heard. The first stage is whether jurisdiction in the international or treaty sense is established. Treaty jurisdiction is dependent upon whether the lawsuit is in the proper country or "place" as provided in section 28(1). *Smith v. Canadian Pacific Airways,* 452 F.2d 798, 800 (2d Cir.1971). The "places" for suit under 28(1) speak to nation-states and not to areas within nation-states. *Mertens v. Flying Tigers Line, Inc.,* 341 F.2d 851, 855 (2d Cir.1965). The second stage queries,

assuming treaty jurisdiction is established, whether a court within the chosen national forum has jurisdiction. The court chosen within the national forum must have jurisdiction under the domestic law of that forum. *Hill v. United States,* 550 F.Supp. 1048, 1053 (D.Kan.1982). Finally, the appropriateness of the domestic court to hear the claim is determined by the local law of the forum, i.e. venue. *Smith,* 452 F.2d at 800 ("It is only after jurisdiction in both senses is had that the question of venue is reached and a determination made regarding the appropriateness and convenience for the parties of a particular domestic court."); *Hill,* 550 F.Supp. at 1053 ("[W]e hold that the Warsaw Convention does not effect the court's jurisdiction or venue beyond affirming that this suit may properly be heard by a court located within the territorial limits of the United States.").

**22.** We recognize that the above-cited cases do not involve forum non conveniens motions to transfer or dismiss after a Warsaw Convention forum has been selected. *See also Commercial Union Insurance Co. v. Pan American World Airways, Inc.,* 17 Avia.Cas. (CCH) 17,652, 17,653 (N.Y.Sup.1982). Our research indicates no such cases exist. We believe however that they demonstrate the reluctance of American courts to hold that domestic procedural law is unavail-

stated: "No evidence can be found anywhere that the drafters of the Convention intended to alter the judicial system of any country." Robbins, *Jurisdiction Under Article 28 Of The Warsaw Convention*, 9 McGill L.J. 352, 355 (1963). We simply do not believe that the United States through adherence to the Convention has meant to forfeit such a valuable procedural tool as the doctrine of forum non conveniens.

If we were to adopt the plaintiffs' construction of article 28(1) and ignore the language of article 28(2), American courts could become the forums for litigation that has little or no relationship with this country.[23] The plaintiffs' interpretation of article 28(1) cuts against the Convention's underlying purpose of ensuring that a dispute arising out of an air travel accident is litigated in a forum that has an actual interest in the matter. *See* McHenry, *Judicial Jurisdiction Under The Warsaw Convention*, 29 J.Air L. & Com. 205 (1963).

For the above reasons, we hold that article 28(1) of the Warsaw Convention does not prevent a district court from considering and applying the doctrine of forum non conveniens.

### III.

Having decided the district court in this case should and could apply the federal law of forum non conveniens, we now determine, first, what is the federal law of forum non conveniens, second, how should it be applied by a district court, and, third, what is our standard of review on appeal from a denial of a motion to dismiss for forum non conveniens.

### A.

In outlining the appropriate forum non conveniens analysis to be applied in these cases, we begin with the Supreme Court's seminal cases of *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), and *Koster v. American Lumbermens Mutual Casulty Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). *Gulf Oil* and *Koster* established the general principle "that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized." *Gulf Oil Corp.*, 330 U.S. at 507, 67 S.Ct. at 842. The Court stated that in deciding to exercise or decline jurisdiction "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster*, 330 U.S. at 527, 67 S.Ct. at 833. The determination of what is most convenient rests upon several private and public factors which the Court stated should be considered and balanced by a court when presented with a motion to dismiss for forum non conveniens.

> The private interests to be considered are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; probability of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained.

*Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843. The public interest factors include the administrative difficulties flowing from court congestion; the local interest in having localized controversies resolved at home; the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; the avoid-

---

able in a case to which the Convention applies. Our holding today on the Convention issue embodies this same reluctance.

**23.** A simple example will be illustrative. Suppose a Canadian citizen while visiting New York buys a ticket for a Montreal-Frankfurt-Montreal trip on Lufthansa, a German airline corporation doing business in New York. After eight hours of trans-Atlantic flight, the Lufthansa flight carrying our Canadian citizen crashes on the flat coastal plains of northern France near Calais. The surviving widow of the unfortunate Canadian citizen sues Lufthansa in the Southern District of New York for wrongful death of her husband. Her selection of the United States as the Warsaw Convention forum is appropriate since the ticket was purchased in New York. Subject matter jurisdiction and personal jurisdiction exist in the New York forum under federal law. Under plaintiffs' interpretation of article 28(1) the suit would have to be litigated in New York despite the case's limited relationship with the United States.

ance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* at 508–09, 67 S.Ct. at 843. The Court in both *Gulf Oil* and *Koster* emphasized that no one private or public interest factor should be given conclusive weight and that the plaintiff's initial choice is usually to be respected.[24]

▐  The Supreme Court has recently reaffirmed the principles enunciated in *Gulf Oil* and *Koster* as appropriate for use in diversity cases. *Piper Aircraft Co. v. Rey-no,* 454 U.S. 235, 255, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981). While discussing the forum non conveniens doctrine within the context of a diversity case, the Supreme Court recognized no exceptions to its general pronouncements on the doctrine. *See Sherrill v. Brinkerhoff Maritime Drilling,* 615 F.Supp. 1021, 1033–35 (N.D.Cal. 1985). We therefore are of the opinion that the principles enunciated in *Reyno* apply in *all* cases regardless of their jurisdictional bases or subject matter.[25]

▐  In *Reyno* the Court emphasized that prior to balancing the public and pri-

---

**24.** It has been suggested in the parties' briefs that *Gulf Oil* and *Koster* established different standards for dismissal on grounds of forum non conveniens because the Court utilized different language in addressing the issue. We believe this argument is meritless and agree with the District of Columbia and Second Circuits that the two cases establish a single "balancing of conveniences" approach. *See Pain v. United Technologies Corp.,* 637 F.2d 775, 783 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Alcoa Steamship Co., Inc. v. M/V NORDIC REGENT,* 654 F.2d 147, 154–58 (2d Cir.), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980).

**25.** We recognize that in Jones Act and general maritime cases we have in the past utilized a modified analysis on forum non conveniens issues. *See McClelland Engineers, Inc. v. Munusamy,* 784 F.2d 1313, 1317 (5th Cir.1986); *James v. Gulf Int'l Marine,* 777 F.2d 193, 194 (5th Cir. 1985); *Cuevas v. Reading & Bates Drilling Co.,* 770 F.2d 1371, 1377–78 (5th Cir.1985); *Ali v. Offshore Co.,* 753 F.2d 1327, 1330 (5th Cir.1985); *Nicol v. Gulf Fleet Supply Vessels, Inc.,* 743 F.2d 289, 292–93 (5th Cir.1984); *In re McClelland Engineers, Inc.,* 742 F.2d 837, 838 (5th Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985); *Koke v. Phillips Petroleum Co.,* 730 F.2d 211, 218 (5th Cir.1984); *Gahr Developments, Inc. v. Nedlloyd Lijnen, B.V.,* 723 F.2d 1190, 1192 (5th Cir.1984); *Diaz v. Humboldt,* 722 F.2d 1216, 1217 (5th Cir.1984); *Fajardo v. Tidewater, Inc.,* 707 F.2d 858, 861–62 (5th Cir.1983); *De Oliveira v. Delta Marine Drilling Co.,* 707 F.2d 843, 845–46 (5th Cir.1983); *Bailey v. Dolphin Int'l Inc.,* 697 F.2d 1268, 1274 (5th Cir.), *reh'g denied,* 710 F.2d 837 (5th Cir.1983); *Vaz Borralho v. Keydril Co.,* 696 F.2d 379, 384 (5th Cir.), *reh'g denied,* 710 F.2d 207 (5th Cir. 1983); *Zekic v. Reading & Bates Drilling Co.,* 680 F.2d 1107, 1108 (5th Cir.1982); *Volyrakis v. M/V ISABELLE,* 668 F.2d 863, 866 (5th Cir.1982); *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015, 1017–18 (5th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Fisher v. Agios Nicolaos V,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981). *See also Liaw Su Teng v. Skaarup Shipping Co.,* 743 F.2d 1140, 1145 (5th Cir.1984) (applying similar analysis in non-Jones Act maritime case).

In these cases we have begun the forum non conveniens analysis by first determining whether United States law governs the actions. This decision is made by considering the factors enunciated by the Supreme Court in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Romero v. International Terminal Operations Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); and *Hellenic Lines v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). If the court determines that United States law does apply, it ordinarily keeps the case. If the court determines that United States law does not apply, the court balances the private and public convenience factors enunciated in *Gulf Oil* and *Reyno. See Ali,* 753 F.2d at 1333 n. 13.

We have never directly addressed the issue of whether this modified analysis for forum non conveniens issues in the Jones Act and maritime areas is consistent with *Reyno.* We have noted that it may not be. *See De Oliveira,* 707 F.2d at 845 (applying modified analysis and citing *Reyno* with *But see* signal); *see also Koke,* 730 F.2d at 218 (same). The circuits are also split as to whether a modified analysis for Jones Act and maritime cases is appropriate. *Compare Cruz v. Maritime Co. of Philippines,* 702 F.2d 47, 48 (2d Cir.1983) (Jones Act cases treated like all other cases on forum non conveniens issues) *with Villar v. Crowley Maritime Co.,* 782 F.2d 1478, 1479 (9th Cir.1986) (adopting modified analysis announced by Fifth Circuit) *and Sigalis v. Lido Maritime Co.-M/V ROYAL ODYSSEY,* 776 F.2d 1512 (10th Cir.1983) (same). None of these cases however have specifically addressed the effects of *Reyno.*

We have found one case that squarely confronts the issue of whether a modified analysis in the context of a Jones Act action is appropriate in the post-*Reyno* era. In *Sherrill v. Brinkerhoff Maritime Drilling,* 615 F.Supp. 1021 (N.D.

vate interests enunciated in *Gulf Oil,* a court must decide whether another adequate forum is available to hear the case because the doctrine of forum non conveniens presupposes the existence of at least two forums in which all defendants are amenable to process. *Id.* at 254 n. 22, 102 S.Ct. at 265 n. 22; *see also Syndicate 420 At Lloyd's London v. Early American Insurance Co.,* 796 F.2d 821, 828 (5th Cir. 1986); *Watson v. Merrell Dow Pharmaceuticals,* 769 F.2d 354, 357 (6th Cir.1985); *Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 968 (2d Cir.1980). *See generally* 15 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3828 (2d ed. 1986) (dismissal predicated on forum non conveniens requires that all parties be amenable in alternative forum). The *Reyno* court also stated that a foreign plaintiff's selection of an American forum deserves less deference than an American citizen's selection of his home forum.[26] *Reyno,* 454 U.S. at 255–56, 102 S.Ct. at 265–66. Finally, the Court held that the

possibility of an unfavorable change in the law to be applied should not be conclusive or even a substantial factor in a court's decision to dismiss for forum non conveniens.[27] *Id.* at 254–55, 102 S.Ct. at 265.

A defendant of course bears the burden of invoking the doctrine and moving to dismiss in favor of a foreign forum. *Syndicate 420,* 796 F.2d at 827–29; *Cheng v. Boeing Co.,* 708 F.2d 1406, 1411 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983). This burden of persuasion runs to all the elements of the forum non conveniens analysis. Therefore, the moving defendant must establish that an adequate and available forum exists as to all defendants if there are several. If the moving defendant carries this initial burden, it must also establish that the private and public interests weigh heavily on the side of trial in the foreign forum. The Supreme Court has held that a moving defendant need not submit overly detailed affidavits to carry its burden, but

---

Cal.1985), the court recognized our approach but decided that it was inconsistent with *Reyno*'s command that federal courts should avoid exercises in choice-of-law or comparative law when addressing forum non conveniens issues. 615 F.Supp. at 1034–35. The court in *Sherrill* also noted that the *Reyno* decision carved out no exception for Jones Act or maritime cases from its broad pronouncement that "[t]he possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry." *Id.* at 1035 (citing *Reyno,* 454 U.S. at 247, 102 S.Ct. at 261).

We also can discern no overriding justification for refusing to apply *Reyno*'s principles and this opinion's procedural rules to forum non conveniens issues in Jones Act and general maritime cases. We believe that a single and uniform approach to the analysis and application of the forum non conveniens doctrine best serves litigants and the courts. We, therefore, expressly disapprove of and overrule our Jones Act and general maritime caselaw that utilizes a modified forum non conveniens analysis. Henceforth, all cases, including Jones Act and maritime actions, are governed by the dictates of *Reyno* and this opinion.\*\*\*

\*\*\* Judges Garza, Johnson, Garwood, and Higginbotham do not join in this footnote.

**26.** The Court's language that a foreign plaintiff's forum selection deserves less deference is not an invitation to accord a foreign plaintiff's selection of an American forum no deference since

dismissal for forum non conveniens is the exception rather than the rule. Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3828, at 291–92 (2d ed. 1986). The fact that plaintiffs are foreign is not, in and of itself, sufficient to require dismissal under forum non conveniens. *See Tokyo Marine & Fire Ins. Co. v. Bell Helicopter Textron,* 17 Avi. Cas. (CCH) 17,321, 17,322 (S.D.Tex.1982); *see also* Fitzpatrick, *"Reyno": Its Progeny And Its Effect On Aviation Litigation,* 48 J. Air L. & Com. 539, 557 (1983).

The Court also cautioned that an American "citizen's forum choice should not be given dispositive weight" and that "dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Reyno,* 454 U.S. at 257 n. 23, 102 S.Ct. at 266 n. 23. *See also Schexnider v. McDermott International, Inc.,* 817 F.2d 1159, 1162–63 n. 1 (5th Cir.1987).

**27.** An unfavorable change in the law which results in the remedy provided by the alternative forum being so clearly inadequate or unsatisfactory such that it is no remedy at all can be given substantial weight by a court. *Id.* at 254–55, 102 S.Ct. at 265. Such a change may allow a court to conclude that a dismissal would not be in the interest of justice. *Id.* at 254 n. 22, 102 S.Ct. at 265 n. 22.

it "must provide enough information to enable the district court to balance the parties interests."[28] *Reyno*, 454 U.S. at 258, 102 S.Ct. at 267.

■ Finally, the moving defendant must submit its motion in a timely manner. There is little case law on this requirement, but some courts have suggested that there are no time limits or standards for motions to dismiss for forum non conveniens. *E.g., Fifth & Walnut, Inc. v. Loew's, Inc.*, 76 F.Supp. 64, 67 (D.C.N.Y.1948). We believe, however, that the better rule would be that a defendant must assert a motion to dismiss for forum non conveniens within a reasonable time after the facts or circumstances which serve as the basis for the motion have developed and become known or reasonably knowable to the defendant. *See* Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction* § 3828, at 291 (2d ed. 1986); *cf. Creamer v. Creamer*, 482 A.2d 346, 352 (D.C.App. 1984) (delay in making motion cuts in favor of denial). While untimeliness will not effect a waiver, it should weigh heavily against the granting of the motion because a defendant's dilatoriness promotes and allows the very incurrence of costs and inconvenience the doctrine is meant to relieve.

### B.

■ We now set out the controlling procedure by which a district court should apply the above principles of forum non conveniens. While we recognize that the decision to grant or deny a motion to dismiss for forum non conveniens is within the discretion of the district court, *see Reyno*, 454 U.S. at 257, 102 S.Ct. at 266, it should be an exercise in structured discretion founded on a procedural framework guiding the district court's decisionmaking process. *Friends For All Children v. Lockheed Aircraft Corp.*, 717 F.2d 602, 607 (D.C.Cir.1983).

■ The district court must first decide whether an available and adequate foreign forum exists. This is a two-part inquiry: availability and adequacy. A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum. *See Syndicate 420*, 796 F.2d at 830; *Pain*, 637 F.2d at 784; *Calavo Growers of California v. Belgium*, 632 F.2d 963, 968 (2d Cir.1980). A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, *Reyno*, 454 U.S. at 255, 102 S.Ct. at 265, even though they may not enjoy the same benefits as they might receive in an American court. *Syndicate 420*, 796 F.2d at 829.

If the court concludes that the foreign forum is both available and adequate, it should then consider all of the relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum.[29] While reviewing the private interest factors, the court should also consider whether the defendant's motion to dismiss was filed in a timely manner.[30]

■ If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors. We agree with the District of Columbia Circuit when it stated that "even when the private conveniences of the litigants are nearly in balance, a trial court has discretion to grant forum non conveniens dismissal upon finding that retention of jurisdiction would be unduly bur-

---

**28.** The Supreme Court has not explained how much detail by a moving defendant is required. We believe the necessary detail will depend upon the particular facts of each case. Each case will present factual situations which might suggest that the parties have greater or lesser knowledge about the facts of the dispute. The issues that are contested will also affect the amount of detail required of a moving defendant. As one court has stated, however, "a motion to dismiss for forum non conveniens does not call for a detailed development of the entire case." *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 451 n. 3 (2d Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 781 (1976).

**29.** *See* note 26 *supra* and accompanying text.

**30.** We believe the timeliness of the motion is one of the private "practical problems" to be considered under the *Gulf Oil* and *Reyno* principles.

densome to the community, that there is little or no public interest in the dispute or that foreign law will predominate if jurisdiction is retained." *Pain*, 637 F.2d at 792.

■ If the district court decides that the above considerations favor trial in a foreign forum, it must finally ensure that a plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice and that if the defendant obstructs such reinstatement in the alternative forum that the plaintiff may return to the American forum.

■ The status of the case when a forum non conveniens motion is decided is most significant in the resolution of the motion. We hold that a district court performing the above analysis, should review the motion in light of the status of the case at the time the motion is filed.[31] We believe the time the motion is filed is the appropriate time frame for considering its validity rather than the time of the action's commencement. There are many factors that might bear on the granting or denial of the motion, e.g., discovery, stipulations, admissions, the joinder or dismissal of parties, which frequently develop or occur after the action commences. Thus, the relevant circumstances at the time the motion is filed should serve as the factual backdrop of the court's decision.

■ Finally, a district court should set out its findings and conclusions supporting the granting or denying of a motion to dismiss for forum non conveniens. The district court's findings and conclusions should be set out in writing or clearly stated on the record. The analytical framework outlined above can serve as an appropriate structure for such findings and con-clusions. Such a practice will enhance our ability to effectively review the decision by focusing the parties and the court on the particular factor(s) upon which relief was granted or denied.[32]

### C.

■ The standard of appellate review for a denial of a motion to dismiss for forum non conveniens is narrow. As the Supreme Court stated:

> [The denial of a motion to dismiss for forum non conveniens] may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.

*Reyno*, 454 U.S. at 257, 102 S.Ct. at 266; *see also Syndicate 420*, 796 F.2d at 828. As with all decisions that are reviewed for abuses of discretion, it is difficult to formulate a list of examples which will be always abuses of discretion. *See generally* Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747 (1982). We can say with certainty that a district court abuses its discretion when it summarily denies or grants a motion to dismiss without either written or oral explanation. We can also state that a district court abuses its discretion when it fails to address and balance the relevant principles and factors of the doctrine of forum non conveniens. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1334 (9th Cir.1984) (court's failure to consider private factors and two public factors in deciding forum non conveniens motion was abuse of discretion), *cert. denied*, 471 U.S. 1066, 105 S.Ct. 2143, 85

---

**31.** *Cf. Schertenleib v. Traum*, 589 F.2d 1156, 1161–64 (2d Cir.1978) (proper time to test availability of the alternate forum is the time the motion is filed).

**32.** The district court should explain its decision-making process clearly and in sufficient detail to permit us adequately to review it, either by giving written reasons or by dictating the reasons for its decision into the record with the same degree of explicitness. We emphasize that both the parties and the district court should endeavor to ensure that specific findings and conclusions are made either in writing or orally on the record.

If we are not supplied with either a written or oral explanation of the court's decision we will not be reluctant to vacate the lower court's judgment and remand because we do not perform a de novo resolution of forum non conveniens issues. *E.g. La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308 (11th Cir.1983) (court vacated and remanded for specification of reasons and development of facts to support decision to dismiss for forum non conveniens).

L.Ed.2d 500 (1985); *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308 (11th Cir. 1983) (district court's dismissal of plaintiff's action without balancing private and public factors or specifying facts supporting dismissal was abuse of discretion); *Founding Church of Scientology v. Verlag*, 536 F.2d 429, 436 (D.C.Cir.1976) (district court's weighing of only disadvantages of one forum was abuse of discretion). Beyond these two examples, we cannot list which decisions will be adjudged abuses of discretion and which will not. Simply stated, our duty as an appellate court in reviewing forum non conveniens decisions is to review the lower court's decisionmaking process and conclusion and determine if it is reasonable; our duty is not to perform a de novo analysis and make the initial determination for the district court. *See Reyno*, 454 U.S. at 257–58, 102 S.Ct. at 266–67.

▮ In deciding whether a district court's denial of a motion to dismiss for forum non conveniens was an abuse of discretion, we may also need to consider an additional factor—the effect, if any, of a subsequent trial of the case. The denial of a motion to dismiss for forum non conveniens is not a final order under 28 U.S.C. § 1291 and, therefore, is not immediately appealable. *Partrederiet Treasure Saga, et al. v. Joy Manufacturing Co.*, 804 F.2d 308, 309–10 (5th Cir.1986).[33] An unsuccessful defendant may seek certification for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), or if this is denied, the defendant can petition this court for a writ of mandamus. *See In re McClelland Engineers, Inc.*, 742 F.2d 837, 839 (5th Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985). The decision to certify an interlocutory appeal pursuant to section 1292(b) is within the discretion of the trial court and unappealable. *In re McClelland*, 742 F.2d at 839. Our intervention in this decision by way of a writ of mandamus is very rare. *See Castanho v. Jackson Marine, Inc.*, 650 F.2d 546, 550 (5th Cir. 1981). Hence, initial appellate review of a denial of a motion to dismiss for forum non conveniens may sometimes follow a trial on the merits.[34] In the present cases the district court refused to certify an interlocutory appeal of the forum non conveniens issue and we refused to issue a writ of mandamus. Pan American, therefore, had to go to trial in the forum selected by the plaintiffs without review of the district court's ruling, as may many defendants whose motions to dismiss for forum non conveniens fail.

The fact that a trial on the merits has occurred in the plaintiff's selected forum does have some effect on our decision of whether the district court abused its discretion in maintaining the action before it.[35]

---

**33.** *See also Rosenstein v. Merrell Dow Pharmaceuticals, Inc.*, 769 F.2d 352, 354 (6th Cir.1985); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 195 (3d Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983); *Nalls v. Rolls-Royce Ltd.*, 702 F.2d 255, 255 (D.C.Cir.), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

**34.** Through our observations that initial appellate review of a forum non conveniens decision may often follow a trial on the merits, we do not suggest that district courts and parties should not use the certification procedure of section 1292(b), nor do we suggest that we will be reluctant to accept such certifications. Certification is a proper method to obtain pre-trial appellate review of a forum non conveniens decision. We, of course, will remain receptive ·to receiving certifications when they are forwarded from the district courts. However, since the decision to certify is within the discretion of a district court, we cannot direct that all forum non conveniens issues be certified. That is a matter dependent upon the particular circumstances of each case and the district court's judgment.

**35.** The fact that a trial has occurred should be considerd only on appellate review. A district court should not consider the fact of a subsequent trial because it should not be addressing a motion to dismiss for forum non conveniens post-trial. The district court has a duty to rule on a motion to dismiss for forum non conveniens before trial for two reasons. First, the district court's decision should be based upon the factual setting at the time the motion is filed which will logically be pretrial. Second, the practice of carrying a motion to dismiss for forum non conveniens through trial frustrates the doctrine's overall purpose of avoiding unnecessary costs and inconvenience.

Nothing in the requirement that a district court rule on a motion to dismiss for forum non conveniens at the time it is filed precludes the

Unless the defendant can show that he was greatly prejudiced by the fact that the trial occurred in the particular forum selected by the plaintiff, we believe the trial's occurrence and completion bolsters the district court's original decision to deny the motion to dismiss. A defendant might establish prejudice by showing key evidence or witnesses were unavailable during trial or that it did not receive a fair trial because of the forum's animosity or prejudice toward it. By pointing out such prejudice, the defendant raises an inference that the trial court's decision to deny the motion was erroneous. In any event the fact that trial on the merits has occurred, following a denial of a motion to dismiss for forum non conveniens, may be a factor to be considered on appeal in deciding whether the trial court abused its discretion. It may often times, however, not come into play if the private and public factors otherwise support the lower court's decision.

## IV.

■■■■ Applying the above principles and standards to the instant cases, we do not find that the district court abused its discretion in denying Pan American's motion to dismiss for forum non conveniens.

These cases do not turn upon a complicated examination of the private and public interest factors that influence a forum non conveniens decision. Rather this case was properly tried in the United States because no other forum could entertain the plaintiffs' actions against all of the defendants. An examination of the record reveals that the district court denied Pan American's motion because the United States was to be a defendant in the plaintiffs' actions. Based upon this finding the district court concluded that Pan American had failed to carry its burden of demonstrating that an alternative foreign forum was available to plaintiffs. We agree with the district court's conclusion that no alternative forum was available.

At the time Pan American made known its intention to seek dismissal based upon forum non conveniens and at the time it filed its motion, the extant parties knew the United States was to be made a party defendant upon completion of the FTCA administrative proceedings. Furthermore, at that time every party including Pan American, proceeded under the assumption that the United States was a party to these lawsuits. The December 16 stipulation contained in Appendix A to this opinion was executed by the plaintiffs, Pan American, and the United States.[36] In papers filed in the district court Pan American stated that "The United States, and it alone, was contemplated by all as an additional party." At the times the district court ruled on the motion to dismiss, both orally and in writing, we believe it was proper for the court to consider the ultimate presence of the United States as a party in evaluating whether an alternative forum was available to plaintiffs.

On appeal Pan American insists that its assurance, contained in the motion to dismiss, to pay any judgment rendered in an alternative forum and its consent to submit to the alternative forum's jurisdiction and its underwriter's commitment to guarantee the payment of any judgment made an alternative forum available. We disagree.

Pan American and its underwriters guaranteed to pay "any judgment rendered against *it*." (emphasis added). The "it" referred to is Pan American and not another defendant such as the United States. Plaintiffs sought recovery from Pan American and the United States, not one or the

court from re-examining its decision in light of facts that develop after the forum non conveniens motion has been resolved. If the defendant properly requests the district court to reconsider its forum non conveniens ruling, the court may review its prior action. However, in any reconsideration the defendant bears the heavy burden of establishing great prejudice to his case or a denial of a fair trial in light of changed circumstances. If the defendant carries this burden, the district court may then alter its original ruling.

**36.** While the December 16 stipulation was entered after the district court's ruling on Pan American's motion to dismiss, we believe it important to note that Pan American and the United States had prior to the motion informed the court of their intention to enter into the stipulation.

other. Plaintiffs in fact recovered a judgment against both Pan American and the United States. Furthermore, Pan American's stipulation to submit to the jurisdiction of a foreign forum cannot act as a stipulation by the United States to consent to the jurisdiction of a foreign forum.[37] Pan American's assurances of payment and jurisdiction were not joined in by the United States nor does the record indicate that they should be attributed to the United States. Pan American's conditional promises simply fail to make all defendants available to plaintiffs in a Uruguayan forum. That is the initial burden Pan American bore in seeking a dismissal for forum non conveniens, and it failed to carry it.

Since the district court correctly concluded that an alternative forum was unavailable, there was no need for it to proceed to a balancing of the private and public interest factors. Pan American's argument that the trial court's failure to perform this balancing was an abuse of discretion is without merit.

Accordingly, we affirm the district court's denial of Pan American's motion to dismiss for forum non conveniens.

### V.

██ Our granting of the petition for rehearing en banc vacates the panel's opinion and judgment. Fifth Cir. Loc. R. 35. Having resolved the forum non conveniens issue raised by Pan Am in its request for rehearing en banc and finding no other issue in the case worthy of en banc discussion,[38] we reinstate the following holdings of the panel:

**37.** For a case in which the United States did join in a motion to dismiss and agreed to consent to the jurisdiction of a foreign forum, see *Friends For All Children v. Lockheed Aircraft Co.,* 717 F.2d 602 (D.C.Cir.1983). The government's stipulation, however, did not persuade the District of Columbia Circuit to reverse a denial of the motion to dismiss. *Id.* at 610.

**38.** Judge Gee vigorously objects to our decision to reinstate the panel's choice of law analysis. He also objects to the amount of damages each foreign plaintiff has recovered. In brief response to his able writing, it is first noted that the conflicts issue is a matter of state not federal law and that matters of state law are rarely worthy of en banc review. En banc review is reserved for only the most important federal law issues and is prompted by the need for a definitive statement on the law by the full court. Nothing in the conflicts issue involves a question of exceptional importance or would result in a decision that would secure uniformity in future decisions. This case merely involved application of established rules to the particular facts of these cases. Thus, as stated above, we are not persuaded that this state law issue is worthy of en banc dissertation.

Second, even setting aside this prudential reason for not reaching the issue, we are not convinced that the panel's treatment of the conflicts issue is incorrect. The issue raised by Pan American was whether the district court erred in applying Uruguayan law to allow Pampin the right to recover for the death of his aunt; this is a recovery not allowed under Louisiana law. The answer to this decision is made pursuant to Louisiana choice-of-law principles. *See Klaxon Co. v. Stentor Electrical Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (state choice-of-law rules applied in diversity cases).

Louisiana has adopted an "interest analysis/most significant relationship" approach to choice-of-law decisions. *See Jagers v. Royal Indemnity Co.,* 276 So.2d 309 (La.1973). Interest analysis is a two-step process. First, the court must determine whether a true or false conflict of interests exists. This determination is made by examining the various competing interests of the states involved with a particular issue. If a false conflict exists, the law of the state with the exclusive interest is applied and the second step is unnecessary. If a true conflict exists, the law of the state with the most significant relationship to a particular issue is applied in accordance with the principles of the Second Restatement of Conflicts of Laws. *See Brown v. DSI Transports, Inc.,* 496 So.2d 478, 481 (La.App.1986); *Burns v. Holiday Travels, Inc.,* 459 So.2d 666, 668 (La.App.1984); *Lee v. Ford Motor Co.,* 457 So.2d 193, 194 (La.App. 2d Cir.1984). This two-step process must be performed for each significant issue in the case. *See Silver v. Nelson,* 610 F.Supp. 505, 513 (E.D. La.1985) (applying Louisiana law). The process of analyzing separate issues within a single case for choice-of-law decisions and applying different laws to different parts of the same case is known as depacage, and Louisiana law has adopted this choice-of-law theory. *See generally* Reese, *Depacage: A Common Phenomenon in Choice of Law,* 73 Colum.L.Rev. 58 (1973).

If a true conflict exists reference would be made to provisions of the Restatement. On the issue of the right to a cause of action for death, section 175 of the Restatement provides:

> In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated

**(1) The district court correctly applied Uruguayan law in recognizing and allowing Pampin's claim for death of his aunt;** [****]

in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Section 6 of the Restatement provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

The first question is whether there is a true conflict of laws on the issue of whether Pampin can recover for the death of his aunt. The laws of the two involved forums are certainly in conflict—Uruguay allows recovery, Louisiana does not—but this observation does not by itself answer whether a true conflict exists. We must also look to the interests of the two states involved. Uruguay's interest in seeing that its law applies is apparent—to ensure that an Uruguayan heir or relative of a Uruguayan citizen wrongfully killed may gain compensation for that wrongful death. Louisiana's interest in seeing its law applied so as to prevent Pampin's recovery is somewhat elusive but it could be argued that Louisiana has an interest in protecting, through limiting the possibility of recovery for wrongful death to a smaller list of relatives, non-resident entrepeneurs, such as Pan American who do business in Louisiana. Assuming that this Louisiana interest does exist, then a true conflict of interests exists on this legal issue and we would turn to the Restatement for guidance.

Considering section 175 and the provisions of section 6, Uruguayan law was properly applied by the district court and affirmed by the panel. While section 175 would give Louisiana the initial nod because it is the situs of the injury, Uruguay's interest in seeing that relatives of a deceased Uruguayan citizen recover damages for those wrongful deaths overrides the speculative interest of Louisiana in protecting non-resident tortfeasors. This decision is also consistent with the concerns expressed in section 6(2), (b), (c), and (d) of the Restatement.

Any decision here also has to be influenced by the district court's determination that Uruguayan law properly governed the issue of whether Pampin could recover damages for the death of his aunt. "The well-settled rule in this Circuit is that on review we accord significant weight to a federal district court's determination of the law of the state in which it sits." *Browning Seed, Inc. v. Bayles,* 812 F.2d 999, 1004 (5th Cir.1987); *Armstrong v. Farm Equipment,* 742 F.2d 883, 886 (5th Cir.1984).

The dissent's primary complaint is that the result in this case involves application of a law that no sovereign would apply and that the Uruguayan citizens seeking recompense for the wrongful deaths of their relatives are able to recover more here in the United States than they could in Uruguay. On the first point, the very application of the depacage theory often results in an amalgamation of laws depending upon the relative interests of the particular forum to a particular issue. Since Louisiana has adopted this theory we are not free to ignore it in favor of a result we might otherwise think appropriate.

As to the second point, it would seem the dissent wishes to take away with the left hand what it gives with the right. The dissent agrees that the plaintiffs in this case are entitled to litigate their claims in the United States. But the dissent asserts that any recovery they might recover must "approximate" the recovery they could have obtained in a Uruguayan court from a Uruguayan jury. Thus while we say "Yes plaintiff you have shown you are entitled to have your claim heard in the United States," we would add parenthically "But you can not recover the same amount as a native litigant can." Admittedly the United States forum is a generous arena, that of course is one reason why it is a popular forum for litigants. But entitlement to be heard in a United States forum is not automatic, as we have discussed earlier. Hence, since these plaintiffs have demonstrated that their cases are properly within a federal forum we can discern no reason to deprive them of the full benefits of that forum. The dissent argues that this is somehow unfair to Pan American. Nothing, however, appears unfair in requiring Pan American to compensate these Uruguayan citizens for the death of their relatives by American jury standards when Pan American was admittedly responsible for their deaths in the United States and when Pan American charged the same price for airfare in the United States to the deceased Uruguayan passengers as it did to domestic passengers. Both facts indicate that Pan American could reasonably anticipate being held accountable to American standards for the deaths of these foreign citizens.

[****] Chief Judge Clark and Judges Garza, Gee, Garwood, Jolly, Davis, and Jones do not join in the opinion's reinstatement of the panel's choice-of-law decision.

(2) The district court correctly denied Pan American's invocation of the Warsaw Convention liability-damages limitation;

(3) The plaintiffs-appellees' awards for pre-impact damages is affirmed but remitted to $7,500 for each decedent and if plaintiffs-appellees do not accept such remittitur then a new trial on these damages is ordered;

(4) The award to Pampin for the post-impact pain and suffering of his aunt is affirmed without alteration;

(5) The award to Pampin of $250,000 for the loss of his mother is affirmed without alteration;

(6) The award to Pampin for the loss of his sister is affirmed but remitted to $50,000, and if Pampin does not accept this remittitur then a new trial on these damages is ordered;

(7) The awards to the Trivelloni-Lopez children for the loss of their parents is affirmed without alteration;

(8) The district court correctly refused to discount the damages for loss of love and affection to present value;

(9) The district court correctly awarded pre-judgment interest against Pan American; and

(10) Interest can be awarded against the United States only from the date of judgment, therefore, the portion of the judgment awarding pre-judgment interest against the United States is reversed and it is directed that a correct judgment be entered on remand.

For the reasons stated above, we AFFIRM the district court's denial of Pan American's motion to dismiss for forum non conveniens. As to the other issues raised in this appeal, we AFFIRM in part, REVERSE in part, REMIT in part or alternatively order a new trial on particular damages, and REMAND to the district court for entry of a judgment consistent herewith.

## APPENDIX A

It is hereby stipulated and agreed by and between the plaintiff(s) herein and Pan American World Airways, Inc. and the United States of America, defendants herein, by and through their respective attorneys as follows:

1) The plaintiff(s) in this action purport to be the proper plaintiff(s), personal representative and/or next of kin who have commenced an action against Pan American World Airways, Inc., the Boeing Company, the United States of America, United States Aviation Underwriters, Inc. and/or the New Orleans Aviation Board (hereinafter referred to as "the defendants") alleging damages as a result of the death of, or injury to, Electra Lorenzi de Trivelloni and Luis Trivelloni and other damages allegedly sustained as a result of this accident.

2) There are numerous contested issues arising out of this litigation that may result in uncertainty and extensive proceedings and the parties are desirous of saving the time and expense of all parties and of the Court.

3) Defendants Pan American and the United States shall not contest their liability for compensatory damages in this case and plaintiff(s) shall not be required to establish their liability for such compensatory damages. The Court may enter judgment for plaintiff(s) for compensatory damages after trial, in an amount determined by the jury or Court, whichever is applicable.

4) In consideration for the agreement by defendants Pan American and the United States not to contest the issue of their liability for compensatory damages in this action, plaintiff(s) agree (1) to waive all other claims for damages, including any claim for punitive or exemplary damages, (2) to dismiss any such causes of action in the Complaint herein, and (3) to dismiss all defendants, other than Pan American and the United States, from this action with prejudice and without costs.

5) The Warsaw Convention/Montreal Agreement limitations on recoverable compensatory damages shall be preserved as a defense herein by Pan American as against any plaintiff(s) where applicable. All other

defenses, except the defense of no liability for compensatory damages, are reserved by Pan American and the United States.

6) In the event plaintiff and defendants Pan American and the United States are unable to agree on the law applicable to the issue of compensatory damages, the issue shall be decided by the transferee court so that if this case is remanded to the transferor court for trial the only issue to be tried will be the quantum of compensatory damages pursuant to the applicable law, as determined by the transferee court.

7) The right to appeal from a compensatory damage judgment (except as to liability therefor) is reserved to plaintiff and defendants Pan American and the United States.

8) Defendants Pan American and the United States shall not contest their liability for provable property loss of damage claims made by plaintiff(s) herein but reserve the right to assert any applicable tariff and contractual exclusions and limitations to liability with respect thereto.

9) In the event the parties hereto are unable to negotiate a settlement of the compensatory damage claims, they shall except by agreement of the parties or a Court order to the contrary agree to a non-binding settlement conference before that individual, or individuals, designated by this Court before the issue of compensatory damages is the subject of trial.

10) As a condition precedent to the payment of the compensatory damages referred to above, plaintiff(s) and their attorneys hereby agree to deliver a general release, in a form satisfactory to the defendants, fully discharging the defendants named herein, their insurers and any other entities who are or may be claimed to be responsible in whole or in part for this accident from all liability of any nature to plaintiff(s).

11) The approval of this stipulation by the attorneys for each of the defendants herein is in no way to be construed as an admission of responsibility or liability by any individual, corporation or governmental entity for the damages alleged in the Complaint filed in this action, said responsibility and liability being expressly denied by each of said defendants; but this stipulation is solely and unconditionally intended to accomplish the fair and expenditious compensation of plaintiff(s) insofar as they are proper parties to this action, without reference to fault or responsibility, and nothing contained herein should be construed to the contrary.

12) This stipulation is limited to the parties in this action only and shall not affect the rights of defendants in other litigation arising out of this accident, now pending or hereafter brought.

13) United States Aviation Underwriters, Inc. for and on behalf of the United States Aircraft Insurance Group and all of the other liability insurers of Pan American World Airways, Inc. as of July 9, 1982 hereby guarantee the payment of any judgment rendered against Pan American World Airways, Inc. pursuant to this stipulation in accordance with the applicable aircraft liability insurance policy in effect on July 9, 1982.

/s/ Stephen B. Murray
Stephen B. Murray, Esq.
Attorney for Plaintiff(s)
/s/ Francis G. Weller
Francis G. Weller, Esq.
Attorney for Defendant
Pan American Airways, Inc.
/s/ James P. Piper
James P. Piper
Attorney for Defendant
The United States of America

GEE, Circuit Judge, with whom CLARK, Chief Judge, GARWOOD, JOLLY, DAVIS and JONES, Circuit Judges, join, concurring in part and dissenting in part:

I begin this concurrence and dissent by voicing my whole-hearted concurrence in the majority's analysis and application of the *forum non conveniens* doctrine. The majority provides an excellent exposition of the doctrine and a helpful step-by-step guide to its application. I must dissent, however, on the choice of law issue.

I.

The majority reinstates the panel's holding, concluding: "The district court correct-

ly applied Uruguayan law in recognizing and allowing Pampin's claim for the death of his aunt." For prudential reasons,[1] the majority declines to address the choice of law issue directly, but it does address the merits of the issue in its footnote 38, because it is "not convinced that the panel's treatment of the issue was incorrect." I am convinced on the other hand, that the panel's and the majority's analyses provide a deceptively simple solution to a difficult issue.

Initially, I paused at a choice of law analysis that not only allows Mr. Pampin, a citizen of Uruguay, to recover Louisiana-scale compensation under Louisiana law for the wrongful death of his relatives, but also allows him to recover damages under Uruguayan law for the wrongful death of his aunt, a right not recognized under Louisiana law. It seemed that something had gone awry with an analysis that applied an amalgam of laws which no sovereign would apply to its own citizens. Having embarked on what I had envisioned as a brief

dissent on this point, and having read somewhat in the disputed area, I now find myself fundamentally at odds with the analysis employed by the panel (and approved by the majority) that results in the application of Louisiana's rules governing compensation in the first place.

### A.

We are bound in this diversity case to apply Louisiana's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Louisiana has adopted an approach for resolving choice of law issues that incorporates both interest analysis and the principles embodied in the Restatement (Second) of Conflict of Laws (1969). *Jagers v. Royal Indemnity Co.*, 276 So.2d 309 (La.1973). Section 6 of the Restatement states the general principles that guide choice-of-law determinations:[2]

---

**1.** The majority relies on prudential reasons for declining to reach this issue: the case merely involves "application of established rules to the particular facts" and matters of state law are "rarely worthy of en banc review." For me, this case is an exception to those rules. Our task is to apply the Louisiana law faithfully and correctly. I find no Louisiana cases that directly address this fact pattern, a damages-only controversy brought by foreign plaintiffs. I also find nothing in the state law that indicates a Louisiana court would apply the "established rules" as the majority has. Rather, my reading of the sources upon which Louisiana law relies, the general principles governing interest analysis and the Restatement (Second) on Conflict of Laws, indicates that the majority's analysis fails to recognize the full gamut of principles that guide interest analysis. Understandably so. Interest analysis is relatively young. The decisional base, from which emerge patterns applying interest analysis, has only begun to address the wealth of varying fact situations that present conflict issues. It is not surprising that since the adoption of interest analysis with the *Jagers* decision in 1972 the Louisiana courts have not been called upon to apply the doctrine to the situation presented here. As a federal court, we can reasonably expect to see this issue again. In aircrash disasters, as a rule, the defendant airline concedes liability. (Pan American notes that the last reported mass aircrash disaster case in which liability was contested was nine years ago. *In re Air Crash at John F. Kennedy International Airport*, 479 F.Supp. 1118, 1120–21

(E.D.N.Y.1978). Thus, our court is prone to addressing a damages-only conflict issue in diversity cases brought by plaintiffs foreign to the forum, expecially in controversies arising from mass disasters.

Although the court did not take this case en banc to address the choice of law decision, we are squarely presented with an opportunity to correct what I perceive as a faulty analysis by *our* court. The majority would prefer to finesse the issue. In effect this will saddle an unfortunate panel in the future with the difficult task of sorting through the issue, guided in all probability by no definitive statement from the Louisiana courts and a patchwork of ambiguous and contradictory thoughts in this en banc decision. The rule in this Circuit is that only through the en banc process will a panel opinion be overruled. Thus, even if a majority of the Court should ultimately disagree with the view adopted in a panel opinion, the "prudential reason" for declining to decide this issue—that this is a state law question—will still remain. Unless and until the Louisiana courts reach this precise issue, which they have not in the past fourteen years, we are in danger of confirming the aphorism that "Some courts live by correcting the errors of others and adhering to their own." *Ellison v. Georgia R.R.*, 87 Ga. 691, 695–96, 13 S.E. 809, 810 (1891).

**2.** These principles apply when the choice of law is not specifically governed by state statute. *See e.g., Shaw v. Ferguson*, 437 So.2d 319 (La.App. 2d Cir.1983).

a. the needs of the interstate and international systems;
b. the relevant policies of the forum;
c. the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;
d. the protection of justified expectations;
e. the basic policies underlying the particular field of law;
f. certainty, predictability and uniformity of result; and
g. ease in determination and application of the law to be applied.

The Restatement further explains that the "forum should seek to reach a result that will achieve the best possible accommodation" of the relevant policies of all other interested states, adding that "it is fitting that the state whose interests are most deeply affected should have its local law applied." Restatement (Second) of Conflict of Laws § 6 comment f (1969).

The first step in interest analysis is to determine whether a "true" or "false" conflict exists. "A false conflict occurs when, after examining the content and objectives of the laws of states A and B relating to the specific issues, it is found that only state A has an interest in the application of its law and that state B has no interest." *Jagers*, 276 So.2d at 312 n. 2 (citation omitted). If a false conflict is found, the analysis ends—simply apply the law of State A, the only one having an interest. The Louisiana courts resolve a true conflict, with reference to the Restatement, by applying the law of the state with the "most significant relationship" to the occurrence and the parties.[3] At this stage, one state is determined to have the "lesser interest" in applying its law.[4]

The panel apparently found a false conflict. It determined that Uruguay had "no interest" in applying its law, because the recovery under Louisiana law "equals or exceeds" that available under Uruguayan law. "[I]t is beyond the pale of reason to conclude that Uruguay would have an interest in prohibiting the award, provided no Uruguayan defendant is involved. We are persuaded that the needs of the international system will be served best in this instance by application of the law of Louisiana." 789 F.2d 1092, 1097.

On the issue whether Pampin should be allowed to recover for the wrongful death of his aunt, however, the panel employed the technique of depecage—splitting the "issues" and subjecting each "issue" to a separate interest analysis to resolve which state's law should apply. The panel separately analyzed Uruguay's interest in applying that aspect of its wrongful death jurisprudence which purportedly recognizes a nephew's right to recover for the death of an aunt. The panel concluded that because Louisiana law provides no such recovery, the law of Uruguay should apply. Presumably, Uruguay's interest in affording this type of recovery for its citizen prevails. Presumably also, Louisiana has a lesser interest or no interest in extending the protections under its laws to these non-Louisiana defendants.

---

**3.** For example, the Restatement's general rule for torts is:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(3) the place where the injury occurred,

(4) the place where the conduct causing the injury occurred,

(5) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(6) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts of Laws § 145 (1969).

**4.** We discover, however, the two steps are interrelated: whether a state has "no interest," because no relevant state policy is implicated, depends not only on the content and objectives of its laws, but also on the relationship of these policies to the controversy and the parties—a question resolved in the second step.

### B.

I begin my analysis by identifying the interests of Louisiana and Uruguay, by reference to the policies of those states that are at stake here. It is clear that the state where the plaintiff is domiciled has an interest in seeing that its citizens are adequately compensated for the effects visited upon them by the tortious conduct of others. *Brown v. DSI Transports, Inc.*, 496 So.2d 478 (La.App. 1st Cir.), *writ denied*, 498 So.2d 18 (1986).[5] This implies that the domiciliary state has an interest in applying its compensation scheme, as a *minimum*, for the benefit of its residents.

The sovereign at the place of the wrong has an interest in regulating conduct within its borders. That interest, however, is not directly implicated in today's case, because both defendants have conceded liability; the conflicts issue is narrowed to determining which state's rules should apply to compensation in wrongful death cases. The interest of the place of the wrong in applying its compensation scheme for the benefit of the out-of-state plaintiff is elusive. It could be said that the place of the wrong has an interest that *some* compensation be afforded, on the theory that this promotes deterrence of tortious conduct within its borders. Difficulties with that theory aside,[6] the issue reduces to this: whether the *differential* between a lower recovery

under foreign law and a higher recovery under local law would have any effect on the prospective measures the defendants take to prevent this type of accident. I am unwilling to conclude that this effect would be appreciable.

If recovery under Louisiana law exceeds that under Uruguayan law, the situation does not present a false conflict, but an "unprovided-for" case.[7] The law of the plaintiff's state favors the defendant and the law of the defendant's state favors the plaintiff. A vacuum is created because *neither* state is said to have an "interest" in applying its law relative to the other.[8] It is patent both that Uruguay has no interest in protecting this out-of-state defendant and that Louisiana has no interest in providing higher compensation than the foreign plaintiff would receive in his home state forum.

The flaw in the panel's analysis is in its unexamined assumption that, having found that Uruguay had "no interest" in prohibiting the potentially higher recovery under Louisiana law, that Louisiana law *should* be applied. There is no reason for that assumption. Instead, we must begin anew to ascertain which state's law should fill the vacuum. The panel never took this second step. Because it should have done so, I shall.

---

**5.** The domiciliary state's interest in insuring that its residents are adequately compensated in wrongful death actions is well-recognized. *Mahfoud v. Eastern Airlines, Inc.*, 17 Av.Cas. (CCH) ¶ 17, 714, 17, 715 (W.D. La. 1982), *aff'd mem.*, 729 F.2d 777 (5th Cir.1984), 474 U.S. 213, 106 S.Ct. 586, 88 L.Ed.2d 522 (1985); *Guillory v. United States*, 699 F.2d 781, 786–89 (5th Cir. 1983); *Gordon v. Eastern Airlines, Inc.*, 391 F.Supp. 31, 33–34 (S.D.N.Y.1975); *In re Air Crash Disaster Near Chicago, Ill.*, 480 F.Supp. 1280, 1283 (N.D.Ill.1979), *aff'd*, 644 F.2d 633 (7th Cir.1981) (the domicile state has an interest in the administration of the decedent's estate and with the provision of adequate compensation to the decedent's surviving relatives.)

**6.** This is premised on the assumption that one can logically speak of the deterrence of unintentional tortious behavior.

**7.** B. Currie, *Selected Essays on the Conflict of Laws* 152–56 (1963). The majority begins its analysis with the depecage issue and does not address this fundamental difference in our

analyses: in the first stage of the analysis, this case presents neither a "true" or "false" conflict, but an "unprovided for" case, a distinction long ago recognized by our brother Rubin, then on the district bench, in Louisiana's approach to interest analysis. *Ardoyno v. Kyzar*, 426 F.Supp. 78, 83 n. 14 (E.D.La.1976) (citing Currie's definition of an "unprovided-for" case, but not reaching the issues presented in such a case).

**8.** In the true-false conflict dichotomy, at least one state is "interested" in applying its laws; because such would significantly advance its policies. When the application of that interested state's law would not hinder the policies of another contact state, the law of the interested state should apply. *See e.g. Jagers*, 276 So.2d at 312 n. 2 (a false conflict occurs when "it is found that *only state A has an interest* in the application of its law and that state B has no interest") (attributing this language to Brainerd Currie) (emphasis added).

### C.

To resolve unprovided-for cases, the *Jagers* decision indicates Louisiana would look to the general choice-of-law principles in Section 6 of the Restatement. Concerning "relevant state policies," Uruguay's jurisprudence represents its views on what constitutes adequate and just compensation for its citizens in a scheme it considers fair to impose upon its own citizen tortfeasors. Only tenuous theoretical bases support Louisiana's interest, as the place of the wrong, in advancing its recovery scheme for the benefit of this plaintiff.

In the unprovided-for case, the "relative interests of the states in the determination of the issues" do not come into play: neither state has an interest in applying its law relative to the other. Concerning the needs of the international system, comity does not require more respect for Uruguay's interest in this plaintiff than that Uruguayan law be applied as a Uruguayan forum would apply it, that he receive what his own sovereign would grant him under its own law.

The place of the wrong may be said to have an altruistic interest in extending the benefits of its recovery scheme to nonresidents. *See, e.g., Labree v. Major,* 111 R.I. 657, 306 A.2d 808 (1973). I detect, however, that this "interest" is grounded in a one-sided view that it is not unfair to apply to the defendant the law of the place of the wrong when it affords the plaintiff a higher recovery than does the domiciliary state's law.[9] The other side of the coin must be acknowledged—it is not unfair to apply the domicile state's scheme, even though it may afford a lower recovery. To fill the vacuum reflexively in unprovided-for cases with the law that maximizes recovery *is* unfair to defendants. Unlike most economic situations, the damage suit is a classic zero-sum game and hence is subject to a simple static analysis: what the plaintiff gains, the defendant loses. Yet, today this Court in effect approves a "maximization of recovery" rule: Whatever rule produces the largest verdict is intrinsically preferable and should be chosen. I am unable to square such a general presumption that a plaintiff should always recover as much as possible with any notion of even-handed justice. Such a rule that mindlessly magnifies what one person can take from another in a legal encounter has no more essential and intrinsic merit than one which mindlessly minimizes it—assuming that our concern is justice.

I find no indication that Louisiana espouses a recovery-maximizing rule[10] or that interest analysis justifies one. Indeed, the point is not to minimize or maximize recovery, but to accommodate relevant policies of the states who are interested in the results of the litigation. The matter leaps into focus the moment the shoe is placed on the other foot: would we apply Uruguayan standards of compensation to the relatives of Louisiana residents killed in Uruguay?[11] Interest analysis requires us to examine both Uruguay's and Louisiana's interest in the controversy and the parties. The domiciliary state's interest in applying its rules

9. In *Labree,* a Massachusetts plaintiff sued her Rhode Island driver for injuries sustained in an automobile accident occurring in Massachusetts. It was an "unprovided-for" case, because, Rhode Island, the defendant-driver's state, imposed ordinary negligence standards with respect to guests—law unfavorable to the defendant—and Massachusetts applied gross negligence standards—law unfavorable to the plaintiff. The Rhode Island Supreme Court found nothing wrong with holding its own citizens to a higher standard of care than that imposed by the states to which they travel, "no matter who may be injured by their misconduct." 306 A.2d at 818.

10. *See, e.g., Lee v. Ford Motor Co.,* 457 So.2d 193 (La.App. 2d Cir.), *writ denied,* 461 So.2d 319 (La.1984) (applying unfavorable Louisiana law to Louisiana plaintiff); *Burns v. Holiday Travels, Inc.,* 459 So.2d 666 (La.App. 4th Cir.1984) (applying unfavorable Florida law to Louisiana plaintiff); *Decatur v. United States Fidelity & Guar. Co.,* 464 So.2d 854 (La.App. 5th Cir.1985) (denying benefits of Louisiana law to temporary Louisiana resident).

11. The question, when appended, sheds light on the depecage issue. Let us assume all Uruguayan compensation rules at least "equal" those of Louisiana: would we apply Uruguayan standards of compensation to the relatives of Louisiana residents killed in Uruguay, even if Uruguay, but not Louisiana, allows recovery by a nephew or niece for the death of an aunt?

affording higher recovery is strong, but that interest does not necessarily predominate in a true conflict case, *e.g.*, when the plaintiff, whose home state law is favorable to him, acts out-of-state, and the defendant acts only in a jurisdiction whose law favors him. *See e.g., Burns v. Holiday Travels, Inc.*, 459 So.2d 666 (La.App. 4th Cir.1984).

Because in unprovided-for cases it is fair to the plaintiff to apply his home state's compensation scheme, forum *qua* forum interests convince me that the domiciliary state's rules *should* fill the vacuum. Aircrash and other mass disasters typically present both domestic and international conflicts in compensation issues. Typically also, unprovided-for cases are presented when any forum affording jurisdiction over the defendant(s) offers the potential for higher recovery than does the plaintiff's home state forum.[12] Forum *qua* forum interests indicate a need for the predictable application of the domiciliary state's recovery in cases like this one. Concededly, the courts will encounter difficulties in finding and applying foreign law when the forum state is not the state of domicile. In the long term, however,—and most clearly of all in cases (such as this) where damages alone are at issue—certainty and uniformity are enhanced when compensation is predictably based on the domicile's scheme, with the fortuitous place of the accident and the availability of jurisdiction in forums with plaintiff-favoring laws are removed from the calculus. In the end, the interest in judicial efficiency is served: the predictable choice of the domicile state's law should encourage settlement and discourage forum shopping.[13]

### D.

I return to the use of depecage in this case.[14] This technique is a recognized[15] and valuable tool in interest analysis, but one highly subject to producing distorted results. In splitting the issue as it did, the panel created a classic depecage problem, that of producing a result different from that obtainable under the legal system in *either* contact state, i.e. Louisiana or Uruguay. This result alone signals the need for reexamination of our choice of law or laws. The touchstone to the reevaluation is whether this result "produces a better accommodation of relevant state policies than would mirroring the intrastate result in any of the contact states and consequently is neither irrational nor unfair to the losing party." R. Weintraub, *Commentary on the Conflict of Laws*, 73 (3d Ed.1986).

In splitting the issue as it did, the panel created a true conflict. The panel correctly concluded that Uruguay had an interest in applying its rule that affords a greater recovery. It failed to acknowledge, however, that Louisiana has an interest in protecting not just its own resident-defendants but also entrepreneurs doing business in its state. *Karavokiros v. Indiana Motor Bus Co.*, 524 F.Supp. 385, 387 n. 1 (E.D.La.1981) (citing B. Currie, *Selected Essays on the Conflict of Laws*, 704–05 (1963)). Sound reasons support that interest, not the least being that one who is plundered in the courts of a state will, insofar as he has a choice, minimize his contacts there. While that interest may not always prevail in a true conflict, to fail to recognize it, once

---

**12.** From this accident alone, foreign plaintiffs filed 52 actions in the United States on behalf of 42 foreign residents who died in the crash.

**13.** When the laws in putative conflict are perceived as affording equivalent recoveries, the forum interest in efficiency points to application of the familiar local law. The values of certainty and predictability, however, point to the application of domiciliary law if the comparison of laws shows discrepancies.

**14.** If the suggested choice of the domiciliary state's compensation scheme is adopted, it is ultimately unnecessary to reach the depecage issue in cases such as this. I reach it here because it is an integral part of the majority's analysis.

**15.** For example, Section 145 of the Restatement provides: The rights and liabilities of the parties with respect to *an issue* in tort are determined by the local law of the state which, *with respect to that issue,* has the most significant relationship to the occurrence and the parties under the principles stated in § 6. Restatement (Second) § 145 (1969) (emphasis added). *See also* Reese, *Depecage: A Common Phenomenon in Choice of Law,* 73 Colum.L.Rev. 58 (1973).

again, gives effect to a maximum recovery rule: the overall effect of the panel's choice of law decisions was to impose on the defendants all the burdens of Louisiana law and yet deny them its benefits.

Several other factors cast suspicion on the need to "accommodate" Uruguay's interest by creating this amalgam of laws. It was a matter of dispute whether Uruguay would recognize Pampin's alleged right to recover either wrongful death damages or his right to maintain a survival action grounded in his decedent aunt's personal injury claims.[16] There were other nieces and nephews whose claims the court had earlier dismissed without prejudice. If Uruguay recognizes a right to recover in any of these claimants, there is a high probability these relatives will raise these claims in a Uruguayan court.[17] Given these circumstances, the process of "accommodating" the Uruguayan interest in

applying this narrow rule embedded in its compensation and succession scheme was unwarranted.[18]

## II.

This case also illustrates a need to reassess our review for excessiveness of jury awards made by United States juries in foreign cases. I do not quarrel with the considerable circumspection with which an appellate court reviews jury awards. *See, e.g., In re Air Crash Disaster Near New Orleans (Giacontieri)*, 767 F.2d 1151, 1155 (5th Cir.1985). We look first to the facts in the record; then, for "rough guidance" we examine past awards for similar injuries. *Id.* at 1156. In reviewing awards made under foreign law, the rough guidance to which we look for comparative purposes should be supplied by the same culture that supplies the law. It cannot be gainsaid

---

16. Pan Am's expert in Uruguayan law contended that Pampin would recover for neither cause of action under Uruguayan law: a nephew's recovery for moral (nonpecuniary) damages is without Uruguayan precedent; several Uruguayan decisions support the proposition that children, let alone other relatives, cannot recover for a decedent's alleged fright or pain before death.

On the wrongful death claim, Pampin was awarded $13,000 for the loss of his aunt's love and affection. On the survivor's action, the jury awarded $12,000 for postimpact pain and suffering and $25,000 for preimpact suffering. The panel remitted the latter to $7,500.

17. The aunt had no children. If the wrongful death claims are cognizable under Uruguayan law, Pan Am remained subject to defending these cousins' claims in a Uruguayan forum. Does Uruguay have an "interest" in the survival action? You bet your family it does. If Uruguay recognizes this claim, it has an interest in distributing the proceeds according to its own succession scheme.

18. Beyond this specific circumstance, I question the need for depecage when compensation is the only issue. The majority states that Louisiana law requires a separate interest analysis of each significant issue in the case, relying on *Silver v. Nelson*, 610 F.Supp. 505, 513 (E.D.La.1985). This is true, but the *Silver* Court's language warrants full quotation:

This two-part analysis must be performed separately for every significant issue in the case, for, under interest analysis, "cases can be expected to arise with some frequency where

different states have the greatest concern in the determination of different issues." *Id.* at 513 (citing *Ardoyno v. Kyzar*, 426 F.Supp. 78, 81 (E.D.La.1976); quoting Reese, *Depecage: A Common Phenomenon in Choice of Law*, 73 Colum.L.Rev. 58, 59 (1973)).

On the question of what constitutes *different* issues, I again part ways with the reasoning inherent in the panel and majority opinions. When the conflicts question involves liability issues—which imply that the place of the wrong has an interest—and compensation issues—which imply that the domicile state has an important interest—the court's assessment of these interests, when they compete, is like comparing apples with oranges. So long as the end results are reexamined, depecage can provide a better accommodation of a state's interest by isolating relevant policy concerns underlying *different* issues. When the only issues concern damages arising from an unintentional tort, and thus the only relevant policies are those underlying a state's compensation scheme, we do not necessarily need a section-by-section comparison of the orange.

Wrongful death claims, in particular, present a gold mine of issues that can theoretically be split into subissues for choice of law purposes, including rules governing (1) defenses available to the defendant, (2) damages, including types of compensable losses, (3) persons who may bring the action, and (4) the beneficiaries who will share in the recovery. The Restatement generally counsels that the law chosen to govern the right of action for wrongful death, under § 175, should govern these four enumerated subissues. *See* Restatement (Second) § 176–180.

that the plaintiff here has obtained a bounteous—indeed, an all but ludicrous—windfall under Uruguayan standards. The record indicates that the highest comparable Uruguayan award ever made was in 1982, for a total of approximately $17,000; that case involved claims by a widow and four children for the loss of their husband and father. The jury awarded Pampin $250,000 and $150,000 for the loss of the love and affection of his mother and sister respectively. Here, by Uruguayan standards, is compassion run amok. Our courts should at least attempt to approximate the result obtainable under the plaintiff's home state law, in the plaintiff's home state forum. For reasons stated above, in cases like today's, this result would be fair to both plaintiffs and defendants. Moreover, it is counter to forum *qua* forum interests to provide "windfall" awards which serve as the impetus for forum shopping when it is highly likely that the optimal forum for proceedings concerned only with compensation is that of the plaintiff's home state.

My analysis of our review for excessiveness assumes that foreign law supplies the rules governing damages issues. It also illustrates that the choice of law and the appropriateness of the jury award are bound together; both are inextricably tied to the *forum non conveniens* decision, in which the court grants or denies the foreign plaintiff a United States forum, which in turn effectuates the forum's choice of law if it retains the case or nullifies that choice if it dismisses the claim. Although we separately analyze each of the three issues, they form a seamless web, which is distorted by a flawed decision in any of the three.

GARZA, Circuit Judge, concurring in part and dissenting in part:

While I concur in the majority of Judge Hill's opinion, I join in Judge Garwood's concurring opinion as to footnote 25 since I do not believe such footnote is necessary to the decision on the issue of forum non conveniens in this case.

I dissent on the issue of allowing plaintiff Pampin to recover for the death of his aunt. While I joined the decision of the panel on this issue, further reflection has caused me to change my view.

The majority seems to think that questions of state law are not worthy of *en banc* consideration. We, unlike the Supreme Court, do not take a case to pass on only one narrow issue. As the majority concedes, when our court takes a case *en banc* it vacates the panel's opinion and judgment. We are therefore free to correct anything that the panel held and resolve any issue left hanging, even though by itself it would not have deserved *en banc* consideration.

The plaintiff Pampin and his counsel sought the jurisdiction of a federal court sitting in Louisiana in a diversity case. They knew, as the panel and the majority now hold, that Louisiana law would apply. They knew that under Louisiana law plaintiff Pampin could not have recovered for the death of his aunt. Plaintiffs such as Pampin who choose their forum should be held to recover only what that forum can give them under the law of the forum. As thoroughly covered by the majority and the dissent, by choosing Louisiana as the forum plaintiffs were able to get higher awards than they would have gotten in their native Uruguay. By the same token they should have taken the bitter with the sweet and realized that there was no cause of action in Louisiana for recovering for the death of an aunt.

My position is very short and sweet. Once a proper forum is chosen by a plaintiff he must abide by the laws of that forum for all purposes. When a plaintiff chooses the forum he knows what law is available to him in that forum. A court would not then have to indulge in deciding an "interest analysis/most significant relationship" approach to choice-of-law decisions to determine whether or not there is a true or false conflict of interest or adopt the depecage theory. If it had been a Louisiana citizen who lost an aunt in the crash under consideration, he would never be able to recover for the loss of the aunt;

no matter what theories of recovery a court could think of, a Louisiana citizen-plaintiff would never ever obtain what plaintiff Pampin did.

My view would bring certainty, predictability, and uniformity of result in accordance with section 6(f) of the Restatement (Second) of Conflict of Laws and would certainly bring about consistent determination and application of the law to be applied as per section 6(g) of the Restatement. I probably will be a lone voice crying in the wilderness, but I believe that my approach of telling a plaintiff that once he chooses a forum and it is decided that the law of that forum will control, he is choosing his forum with his eyes wide open knowing what he can and cannot recover under the law of that forum.

I therefore dissent in allowing Pampin to collect damages for the death of his aunt in a court sitting in Louisiana.

JOHNSON, Circuit Judge, concurring:

I concur in all of Judge Hill's opinion except footnote 25. I do not join in footnote 25 for the reasons stated in Judge Garwood's concurring opinion.

GARWOOD, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Hill's opinion except footnotes 25 and 38.

In what almost amounts to an afterthought, we employ a footnote to partially overrule more than fifteen published opinions of this Court decided within the last six years. The Jones Act issue is simply not before us in this case, and has not been raised, briefed, or argued. I am not aware of any of our Jones Act cases where the result would have been different had a more clearly *Reyno*-oriented analysis been followed. It would be far preferable, in my view, to determine the interplay of *Reyno* and the Jones Act in a case where the question is squarely presented and makes a difference to the result. I therefore do not join in footnote 25.

As to footnote 38, I join in Judge Gee's dissent.*

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in the judgment:

I concur except in two regards. First, we ought not have treated the Jones Act issue, although I am persuaded by Judge Hill's writing that we should not have a separate forum non conveniens rule for Jones Act cases; nor should we have re-examined the panel's treatment of the Louisiana choice of law issue, an issue we did not take this case en banc to reconsider and which has been treated only in the opinion writing, able though that is.

Second, with deference, I am not persuaded by the analysis of the *Erie* question. I give greater weight to the interests favoring application of Louisiana law and less weight to the federal forum interest in self-administration. In more direct terms, I read *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), and *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), by a different light. The choice between a state or federal rule is in any event so close that I would silently join the majority if the rationale were not otherwise important.

*Hanna* involved a Federal Rule of Civil Procedure governed by the Rules Enabling Act; the *Hanna* court deferred to the Federal Rules, not because of federal forum interests inherent in article III, but because under the Rules Enabling Act, they were approved by Congress, the Advisory Committee, and the Supreme Court. Here we have a judge-made rule of forum non conveniens that displaces an arguably core decision of the state meant to assure its residents a forum in the United States.

Of course, federal courts have an interest in self-administration; they do in every *Erie* decision. But that interest must be viewed with caution when it lacks the support of the Rules Enabling Act mandate or

---

* I agree that the question there considered is one of Louisiana law which we did not take this case en banc to resolve. However, inasmuch as

the issue has nevertheless been addressed, and is presented by this appeal, I deem it appropriate to indicate my view in respect to it.

an independent constitutional interest such as the seventh amendment; these are important, sometimes the dispositive, variables in an *Erie* analysis.

On the state side, it must not be forgotten that Louisiana has no doctrine of forum non conveniens. That is, Louisiana has not accepted the idea that its citizens may be denied the right to a court in the United States for reasons of efficiency or to otherwise husband judicially found resources. We are not choosing between a federal and state rule in circumstances where the federal formulation of a rule, while securing interests similar to a state rule, leads to a different result. Rather, we are asked to reject a decision by Louisiana that lies closer to substance on the spectrum of substance to procedure than would an adopted rule of forum non conveniens.

## I

The majority states that "our task is to evaluate whether applying federal *forum non conveniens* in this case advances or hinders the 'twin aims' of *Erie.*" In *Hanna*, the Court identified the twin aims of *Erie* as (1) discouragement of form-shipping and (2) avoidance of the inequitable administration of the laws. *Hanna*, 380 U.S. at 468, 85 S.Ct. at 1142. The majority contends that the second aim, avoidance of the inequitable administration of the laws, can refer either to extrinsic considerations of the fairness of the competing state and federal rules to the parties, or to intrinsic considerations of the federal forum's own interests. The majority concludes that "*Hanna* intends the latter." But *Hanna* was concerned about the unfairness to citizens of the forum state when different rules are applied in state and federal courts in diversity.

When the *Hanna* court spoke of the twin aims of *Erie*, it also stated, "The *Erie* rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court." *Id.* at 467, 85 S.Ct. at 1141. The *Hanna* court then quoted from *Erie* to explain its point:

Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State. *Swift v. Tyson* [41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842)] introduced grave discrimination by non-citizens against citizens. It made rights enjoyed under the unwritten 'general law' vary according to whether enforcement was sought in the state or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the non-citizen. Thus, the doctrine rendered impossible equal protection of the law.

*Id.* (quoting *Erie Railroad v. Tompkins*, 304 U.S. 64, 74–75, 58 S.Ct. 817, 820–21, 82 L.Ed. 1188 (1938)). The *Hanna* court then added, "The [*Erie*] decision was also in part a reaction to the practice of 'forum-shopping' which had grown up in response to the rule of *Swift-Tyson.*" *Id.* Thus, the twin aims of *Erie*, according to the author of *Hanna*, are discouraging forum-shopping and avoiding discrimination against citizens of the forum state by non-citizens.

Further evidence that the *Hanna* court was referring to unfairness to citizens of the forum state when it stated that the second aim of *Erie* was avoidance of inequitable administration of the laws is found in footnote 9 of the opinion:

*Erie* and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it *would unfairly discriminate against citizens of the forum State*, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

*Id.* n. 9. (emphasis added). Nothing in *Hanna* suggests, as the majority does, that

"inequitable administration of the laws" describes the interests of the federal forum.

The majority avoids the constraint of *Hanna*'s text and argues that the "equal protection" interpretation cannot be correct because it

> would take federal courts into an analysis of the "fairness" of the state rule, in other words, its wisdom and propriety. This could only lead to normative assertions by federal courts that a given state law cannot be applied because to do so would be "inequitable." But it was precisely this normative role, this role of federal courts as prophets of a "brooding omnipresence," that *Erie* condemned. Therefore, *Hanna*'s second aim must refer to the federal courts' own interests in equitable self-administration.

I am not persuaded because as I read it, *Hanna* made clear that the "inequitable administration" concern does not involve a bald evaluation of the fairness of the state rule (an exercise that would be rightfully rejected); rather it asks "whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would *unfairly discriminate* against citizens of the forum State." *Id.* n. 9 (emphasis added).

The twin aims of *Erie* are *not* competing aims. Indeed, they arise from the same source and serve related purposes. If a federal court in diversity applies a tort rule different from the state rule, and the federal rule requires a result opposite to what would be had in state court, then litigants will shop for the forum with the rule favoring their position, *and* a citizen of the state being sued in federal court will not have the same protection of the laws as he would had he been sued in his state's court. This says nothing of the "wisdom and propriety" of the tort rule.[1] I take comfort from the *Hanna* Court's purpose in identifying the twin aims of *Erie:* to explain the contours of the "outcome-determinative" test. The fact that different federal and state rules result in conflicting outcomes matters only to the extent that it gives rise to forum shopping or unfair discrimination against citizens of the forum state.

Finally, the *Hanna* Court's very application of the twin-aims-of-*Erie* analysis to the issue before it suggests that the Court's focus was upon forum-shopping and discrimination against citizens of the forum state, rather than the needs of the federal forum *qua* forum. The issue in *Hanna* was whether service of process must be made in the manner prescribed by state law or that set forth in Fed.R.Civ.P. 4(d)(1). Although the service had satisfied the federal requirements, it did not comply with state law. The Court, after discussing the two purposes served by the outcome-determinative test, noted:

> Though choice of the federal or state rule will at this point have a marked effect upon the outcome of the litigation, the difference between the two rules would be of scant, if any, relevance to the choice of a forum. Petitioner, in choosing her forum, was not presented with a situation where application of the state rule would wholly bar recovery; rather, adherence to the state rule would have resulted only in altering the way in which process was served. Moreover, it is difficult to argue that permitting service of defendant's wife [the federal rule] to take the place of in-hand service of defendant himself [the state rule] alters the mode of enforcement of state-created rights in a fashion sufficiently 'substantial' to cause the sort of equal protection problems to which the *Erie* opinion alluded.

*Id.* 380 U.S. at 469, 85 S.Ct. at 1142–43 (footnotes omitted).

I see *two* interests weighing in favor of applying state law—the twin aims of *Erie.* But as a result of its interpretation of *Hanna,* the majority drops away the related, second interest—avoidance of discrimination against citizens of the forum state.

---

1. Ironically, however, the doctrine of forum non conveniens does take the federal courts into an analysis of the "wisdom and propriety" of exercising jurisdiction. The application of forum non conveniens in conjunction with removal jurisdiction effectively imposes on the citizens of the forum state the federal court "wisdom" not to exercise jurisdiction.

In refusing to apply forum non conveniens, Louisiana has decided to provide greater protection against foreign actors, through access to local courts, than is available in federal courts. Application of the federal rule in diversity will have the potential of depriving the forum state's citizen of the material benefit of a convenient and friendly forum. Thus, although this case involves a twist on the typical *Erie* case—the nonresident defendants receive the benefits from the choice of forum—the attending discrimination against citizens of the forum state is no less real.

## II

Just as the majority's interpretation of the twin aims of *Erie* places too *little* emphasis on the state law interests, it likewise places too *much* emphasis on the federal forum interests in self-administration. The majority argues that "*Hanna* gives us good reason to hold that federal courts have inherent powers under Article III to displace state laws on matters involving their basic competence as courts." The majority reasons that because *Hanna* "held that *Congress* has the power to override state law by the Federal Rules in 'matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either,'" (quoting *Hanna*, 380 U.S. at 472, 85 S.Ct. at 1144) (emphasis added), the *federal courts* have a general power on matters involving their basic competence as courts to override state laws. This slights the fact that *Hanna* involved the question of the validity of a federal rule of civil procedure under the Enabling Act. As the Court in *Hanna* noted:

[I]n cases adjudicating the validity of Federal Rules, we have not applied the *York* rule or other refinements of *Erie*, but have to this day continued to decide questions concerning the scope of the Enabling Act and the constitutionality of specific Federal Rules in light of the distinction set forth in *Sibbach* [*v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941)].

*Hanna*, 380 U.S. at 470–71, 85 S.Ct. at 1143–44 (citation omitted). The Court further explained that

[w]hen a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the typical, relatively unguided *Erie* choice: the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

*Id.* at 471, 85 S.Ct. at 1144 (footnote omitted); *see also Burlington Northern Railroad v. Woods,*, —— U.S. ——, ——, 107 S.Ct. 967, 970, 94 L.Ed.2d 1, 7 (1987) (Fed.R.App.P. 38 applies in diversity suit instead of conflicting state rule). It was in this context then that the Court in *Hanna* held that

the constitutional provision for a federal court system (augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either.

*Id.* 380 U.S. at 472, 85 S.Ct. at 1144. However, *Hanna* does not give *federal courts* the power, beyond the mandate of the Enabling Act or other such statute, "to displace state laws on matters involving their basic competence as courts" without being subjected to the strictures of *Erie*.

The majority argues that such power is inherent in article III, but the Court in *Hanna* stated that the Constitution placed in the hands of Congress the primary power to make rules governing the practice and procedure in federal courts. *Id.* at 473, 85 S.Ct. at 1145; *see also* C. Wright, A. Miller & E. Cooper, 19 *Federal Practice and Procedure*, § 4509 at 140 (1982). I concede that a federal court possesses a *secondary* power of self-management under article III. But I do not think the forum non

conveniens doctrine, which undoubtedly falls into the arguable area between substance and procedure, is entitled to the same presumption of validity in diversity as the Federal Rules of Civil Procedure. Rather, forum non conveniens must survive, if at all, under the standard of *Erie* and at its progeny. We should look to *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), rather than *Hanna*, for the proper *Erie* analysis.

### III

In *Byrd*, the plaintiff, an employee of a contractor that was working for a utility company, was injured while connecting power lines for the utility. The plaintiff brought a diversity suit against the utility for negligence. The utility asserted as an affirmative defense that the plaintiff was its employee within the meaning of the South Carolina Workmen's Compensation Act, and the plaintiff's exclusive remedy was thus compensation benefits under the Act. The *Erie* question was whether the factual issues raised by the affirmative defense were to be decided by the judge or the jury. State law required the judge alone to decide on the evidence whether a defendant was a statutory employer. Federal law required that all disputed questions of fact be decided by the jury. The Supreme Court held that federal law applied.

The *Byrd* Court employed a three-factor balancing test to conclude that federal law applied: (1) the significance or substantive character of the state rule under state law and (2) the likelihood of different outcomes, were weighed against (3) the importance of the federal interests or policies underlying the competing federal rule. *Byrd*, 356 U.S. at 535–40, 78 S.Ct. at 899–902. In weighing these interests the Court noted that the state rule did not rest on any special policy of the state compensation law; nor was the choice of rules here likely to give rise to forum-shopping. On the other hand the Court identified important federal interests at stake:

The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury.

*Id.* at 537, 78 S.Ct. at 901 (footnotes omitted; citation omitted).

The Fifth Circuit considered similar questions in *Boeing v. Shipman*, 411 F.2d 365, 369–70 (5th Cir.1969) (en banc), and *Jones v. Benefit Trust Life Insurance Co.*, 800 F.2d 1397, 1400 (5th Cir.1986). In *Boeing*, the issue was whether the federal courts should apply a federal rather than a state test to determine the sufficiency of the evidence to create a jury question. The court, relying on *Byrd* and *Planters Manufacturing Co. v. Protection Mutual Insurance Co.*, 380 F.2d 869 (5th Cir.), *cert. denied*, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282 (1967), held that the federal test applied in diversity cases. The court reasoned that "[f]ederal courts must be able to control the fact-finding processes by which the rights of litigants are determined in order to preserve 'the essential character' of the federal judicial system." *Boeing*, 411 F.2d at 369–70. The court had reached the same result in *Planters*. There Judge Tuttle explicitly acknowledged the impact of the seventh amendment on the question: "If the seventh amendment requires uniformity in the exercise of the jury trial right in the federal courts, surely that subsumes uniformity in the exercise of the power to direct a verdict or grant a judgment n.o.v." *Planters*, 380 F.2d at 871.

In *Jones*, the *Erie* question again involved the court's division of responsibility between judge and jury. The state law required that the trial judge first determine for himself that a defendant insurer had no "reasonably arguable" basis for denying coverage before submitting the question of punitive damages to the jury. The Fifth Circuit held, without discussion, that the

federal rule governed. *Jones*, 800 F.2d at 1400. As in *Byrd, Planters,* and *Boeing,* the seventh amendment's influence in *Jones* is undeniable. Thus, in my view, *Boeing* and *Jones* are correct not, as the majority suggests, "because the relationship between judge and jury goes to the heart of the independence and integrity of an Article III court," but because the seventh amendment sets one standard for all federal courts for defining the relationship between judge and jury. This interest in uniformity is a powerful federal interest that overwhelms the limited state interest in state rules that would leave for jury decision more than is constitutionally required, rules that implement but are not integral to policies of substance.

## IV

Finally, I disagree with the suggestion in the majority opinion that *Byrd* gives too little recognition to the federal interest in self-administration and that *Hanna* gives more; that under the authority of *Hanna,* we can dispense with *Byrd* altogether.

In my view the Supreme Court's cases must be read together. As Professor Wright put it: "Although Hanna is the Supreme Court's last major contribution to the Erie doctrine, the other principal cases —Erie, York, and Byrd—certainly cannot be disregarded. The four decisions build upon and inform one another." 19 Wright, Miller & Cooper, *supra,* § 4504 at 44.[2] As I have explained, *Hanna* gives more weight to federal forum interests only in the sense that the Enabling Act gives more. But *Hanna* is explicit that in cases not arising under the Enabling Act, we must look to *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (state statute of limitations bars diversity suit) and *Byrd. Hanna,* 380 U.S. at 469–70, 85 S.Ct. at 1142–43.

*Byrd* gives all the recognition to federal forum interests that is warranted under the Constitution. In most if not all *Erie* cases, the federal forum's interest in self-administration is present. *Byrd* suggests that this interest in self-administration outweighs the policies underlying the state law and the interests embodied in *Erie* only when it is bolstered by other uniquely federal interests—in *Byrd* the seventh amendment. Indeed, five years after the decision in *Byrd,* the Supreme Court held that federal rather than state law "governs in determining whether an action is 'legal' or 'equitable' for the purpose of deciding whether a claimant has a right to a jury trial." *Simler v. Conner,* 372 U.S. 221, 221, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963) (per curiam). The Court, citing *Byrd,* explained that "[t]he federal policy favoring jury trials is of historic and continuing strength.... Only through a holding that a jury-trial right is to be determined according to federal law can the uniformity in its exercise which is demanded by the Seventh Amendment be achieved." *Id.* at 222, 83 S.Ct. at 610 (citations omitted; footnote omitted).

To give this federal interest in self-administration even more weight means that judge-made rules like forum non conveniens having some affect on federal court administration would be accorded deferential review comparable to the presumption of validity given Federal Rules. We thus would have moved to the opposite extreme of *York.* As Justice Harlan explained in his concurrence in *Hanna:*

> Whereas the unadulterated outcome and forum-shopping tests may err too far toward honoring state rules, I submit that the Court's "arguably procedural, ergo constitutional" test moves too fast and far in the other direction.

---

**2.** Professor Wright in his separate discussion of forum non conveniens in a different volume, states: "Although the Supreme Court has repeatedly found that it did not need to decide whether state notions of forum non conveniens were binding on a federal court in a diversity action, it seems quite clear that they ought not to be and that these are matters of the adminis-

tration of the federal courts, not rules of decision, so the state rules cannot be controlling." 15 Wright, Miller & Cooper, *supra,* § 3828 at 293–94 (footnotes omitted); but he there addresses a choice between federal and state rules not the use of a federal rule when a state has rejected the concept.

**1186**

*Hanna,* 380 U.S. at 476, 85 S.Ct. at 1146–47 (Harlan, J., concurring). Justice Harlan's words, which gave reason to pause in *Hanna,* applies with even greater force in cases like the present one, outside the bounds of the Enabling Act.

But having said all of this, whether Louisiana's rejection of a doctrine of forum non conveniens is such an exercise of the state's primary power to define the substantive rights of tortfeasors that it ought not be displaced by a rule of administration constructed by federal judges remains a close question; its efficiency concerns so inevitably drive away from substantive policy that one's immediate reaction is that application of a federal rule is surely correct. But I am not so sure when the choice is not between competing rules but between a federal rule and a state's rejection of the doctrine. Regardless, the outcome is not the foundation of my disagreement.